35 U.S. 526 (____)
10 Pet. 526
*THE MAYOR, ALDERMEN, AND INHABITANTS OF NEW ORLEANS, APPELLANTS,
v.
THE UNITED STATES.
Supreme Court of United States.

*533 The case was argued by Mr. Webster, and by Mr. Livingston, for the appellants; and by Mr. Butler, attorney-general, for the United States.
*565 Mr. Justice M'LEAN delivered the opinion of the court.
This case is brought before this court by an appeal from the decree of the district court for the eastern district of Louisiana.
*Under a practice which is peculiar to Louisiana, the [*711 attorney of the United States, on their behalf presented a petition to the court; which represented that the mayor of the city *566 of New Orleans, in pursuance of an ordinance of the city council, had advertised for sale, for a day then past, and was about to advertise anew, for sale, in lots, the vacant land included between Ursuline, Levee, and Garrison streets, and the public road in the city of New Orleans; and also, the vacant land included between the Custom-house, Levee, and Bienville streets, and the public road in the said city.
And the petitioner further stated, that by the treaty of cession of the late province of Louisiana by the French republic of the United States of America, the United States succeeded to all the antecedent rights of France and Spain, as they then were, in and over the said province; the dominion and possession thereof, including all lands which were not private property; and that the dominion and possession of the said vacant lands, ever since the discovery and occupation of the said province by France, remain vested in the sovereign; and had not, at any time prior to the date of said treaty, been granted by the sovereign to the city. And the petitioner prayed for an injunction to restrain the city council from selling the land, or doing any other act which shall invade the rightful dominion of the United States over said land, or their possession of it; and a perpetual injunction was prayed.
To this petition the mayor, aldermen, and inhabitants of the city answered, and denied the material facts and allegations in the petition; and they specially denied that the dominion and possession of the land, at the time Louisiana was ceded to the United States, were vested in either the king of Spain, or the sovereign of France, either as vacant land or under any other denomination.
And in a supplemental answer the respondents say, that the inhabitants of the city of New Orleans are the true and lawful proprietors of the vacant lots they have been enjoined not to sell.
1. "Because all the space of ground which exists between the front line of the houses of the city and the river Mississippi was left by the king of France, under the name of quays, for the use and benefit of the inhabitants of the city.
2. "Because if since the foundation of the city of New Orleans said space of ground became wider than was necessary for the public use, and the quays of the city, it was in consequence of an increase formed by alluvion in the greatest part of the front of the *712] *city; and the works which were necessarily made from time immemorial by the inhabitants of the city, or at their expense, to the levee in front thereof, to advance it nearer to the river than it was formerly.
3. "Because, by the laws of Spain which were in force at the time when said alluvions were formed, and said works were made, alluvions formed by rivers in front of cities belonged to the inhabitants thereof; who may dispose of the same as they think it convenient, on their leaving what is necessary to the public use."
And the respondents say, that the vacant lots are of great value; and cannot be disposed of unless they shall be indemnified by the government, &c.
*567 A general replication was filed by the district attorney in behalf of the United States.
Statements of facts signed by the parties appear in the record.
If this cause be considered on the broad ground on which it is presented by the facts and the arguments of counsel, it is one of great importance. In one view, the title to property of the value of several millions of dollars, depends upon its decision; and in any aspect in which it may be considered, principles of the civil law, and the usages and customs of the governments of France and Spain, and also, it is insisted, important principles of the common law, as well as the effect of certain acts of our own government, are involved.
In the able arguments which have been heard at the bar, these topics have been elaborately examined and variously illustrated; and it now becomes the duty of the court to pronounce their opinion in the case. Being constituted the organ of that opinion, the matters in controversy will be considered under the following arrangement.
1. The rights of the plaintiffs in error, by the principles of the common law.
2. Their rights under the laws and usages of France and Spain.
3. The interest of the United States in the property claimed by the city, and their jurisdiction over it.
That property may be dedicated to public use, is a well established principle of the common law. It is founded in public convenience, and has been sanctioned by the experience of ages. Indeed, without such a principle, it would be difficult, if not impracticable, for society in a state of advanced civilization, to enjoy those advantages which *belong to its condition, and which are essential to its accommodation. [*713
The importance of this principle may not always be appreciated, but we are in a great degree dependent on it for our highways, the streets of our cities and towns, and the grounds appropriated as places of amusement or of public business, which are found in all our towns, and especially in our populous cities.
It is not essential that this right of use should be vested in a corporate body; it may exist in the public, and have no other limitation than the wants of the community at large.
This court had occasion to consider this doctrine in two important and leading causes, which lately came before them, and which are reported in 6 Peters. The first one was the city of Cincinnati v. The Lessee of White.
In 1789, the original proprietors of Cincinnati designated, on the plan of the town, the land between Front street and the Ohio river, as a common for the use and benefit of the town for ever. A few years afterwards a claim was set up to this common, by a person who had procured a deed from the trustee in whom the fee of the land was vested, and who had entered upon the common, and claimed the right of possession. The proof of dedication being made out to the satisfaction of the court, they sustained the rights, claimed by the city. At the time the plan of the city was adopted by the proprietors, and this *568 ground was marked on the plat as a common, they did not in fact possess the equitable title to the space dedicated; but they shortly afterwards purchased the equitable title, and it was held that under the purchase the prior dedication was good.
In their opinion, the court refer to a great number of decisions of this court and others, in this country, and also of the highest courts in England, to sustain the principles upon which the decision was founded. The doctrine is now so well settled, and so generally understood, that it cannot be necessary to cite authorities in support of it.
In the case of Barclay and others v. Howell's Lessee, the same principle was sanctioned, as applicable to facts somewhat variant from those which constituted the Cincinnati case.
In 1784, the representatives of William Penn, in whom the proprietary right of Pennsylvania was vested, by their agent, laid out the town of Pittsburgh. The original plan of the town, the court say, "shows that it was laid out into lots, streets, and alleys, from the *714] *junction of the Alleghany and Monongahela rivers, extending up the latter to Grant street. With the exception of Water street, which lies along the bank of the Monongahela, all the streets and alleys of the town were distinctly marked by the surveyor, and their width laid down. Near the junction of the rivers, the space between the southern line of the lots and the Monongahela river is narrow, but it widens as the lots extend up the river.
"From the plan of the town it does not appear that any artificial boundary, as the southern limit of Water street, was laid down. The name of the street is given, and its northern boundary, but the space to the south is left open to the river. All the streets leading south terminate at Water street, and no indication is given in the plat, or in any part of the return of the surveyor, that it did not extend to the river, as it appears to do by the face of the plat."
And the surveyor being dead, his declarations at the time of making the survey, that Water street should extend to the river, were sanctioned as evidence; and it appearing that the convenience of the town required the extension of this street to the river; and there being no statement or line marked on the plat of the town as opposed to it; and as the public for thirty years or more, in some parts of the town, had thus used the street; and that property had been bought and sold in reference to it, in this form: it was held to be sufficient evidence of its having been dedicated to the public. The street thus extended afforded a large and convenient space for commercial purposes along the shore of the river, beyond what was required for a street.
On the 26th of September, 1712, about thirty-eight years after Louisiana had been taken possession of by Lasalle, in the name of the king of France, a charter was granted by the king to Crozat, conferring on him exclusive rights for commercial and other purposes, over a great extent of country, which included the territory that now forms the state of Louisiana.
The absolute property in fee simple was vested in him, of all the lands he should cultivate, with all buildings, &c., he taking from the *569 governor and intendant grants, which were to become void on the land ceasing to be improved.
The laws, edicts, and ordinances of the realm, and the custom of Paris, were extended to Louisiana. This charter was afterwards surrendered by Crozat to the King; and a new one was granted on the 6th of September, 1717, to a corporation styled the Western *Company. The land, coasts, harbours, and islands in Louisiana, [*715 were granted to this company, as they had been to Crozat, "it doing faith and homage to the king and furnishing a crown of gold, of the weight of thirty marks, at each mutation of the sovereignty."
The power is given to this company to grant land allodially. And under its auspices, the ground where the city of New Orleans now stands, was selected as a place for the principal settlement of the province. A short time afterwards, the foundation of the city was laid, by the construction of a few huts and other improvements. In 1724, and also in 1728, by the facts proved, it seems, maps of the town were made, on which the vacant space, now in controversy, was designated by the name of quay.
The Western Company continued to act under its charter until January, 1732, when, with the king's leave, the charter was surrendered, and a retrocession was made by the company of the "property, lordships, and jurisdiction of Louisiana."
The town of New Orleans was established, and the plan, as designated in the maps referred to, adopted, while the country was under the jurisdiction of the Western Company; and the dedication to public use, of the vacant space in contest, was made by it, so far as a dedication is shown by the plan and the endorsement of the word quay upon it.
In the agreed facts, a quay is admitted to be a vacant space between the first row of buildings and the water's edge, and is used for the reception of goods and merchandise imported or to be exported. In the civil code of Louisiana, a quay is said to be "common property, to the use of which, all the inhabitants of a city, and even strangers are entitled in common, such as the streets and public walks."
The term is well understood in all commercial countries; and whilst there may be some differences of opinion as to its definition, there can be little or none in regard to the popular and commercial signification of it. It designates a space of ground appropriated to the public use: such use as the convenience of commerce requires.
This entire vacant space has been used for the purposes to which it was appropriated, with but occasional and slight interruptions to small portions of it, from the establishment of the designation of the quay in 1724, until the present time. The interruptions referred to, were not such as deprived the public of the proper use of the ground. They were generally of a temporary nature, and were permitted, *where private accommodation was in some degree [*716 connected with the public convenience. Temporary shops, *570 and baths, which were constructed upon this ground, were of this character.
The public established, at different times and for different purposes, buildings of a more permanent description; but these were rendered necessary for the public service, and they seem not to have encroached, to any injurious extent, on the public use of the quay.
Some of these buildings have long since disappeared, and any of them which may still remain, do not subject the city or the public to any inconvenience.
The city authorities, at an early day, would scarcely be expected to object to the construction of barracks on this space for the accommodation of the soldiers, which were there stationed for the protection of the city. And much less would they be expected to object to the use of the common for the occasional performance of military evolutions.
The custom-house and public warehouse, erected on this ground by the Spanish government, have disappeared; and the construction of the present custom-house on the quay, by the federal government, in 1819, cannot be considered as affecting the original dedication.
It may be convenient for the city to have the custom-house situated on this ground, and it does not interrupt the public use.
Two or three grants to small lots of ground within this common, were made under the Spanish authorities; but under the present head of inquiry, it is unnecessary to examine whether these acts were not the exercise of arbitrary power, by the Spanish officers, and being held in derogation of vested rights, should not be held as nullities.
If these titles were given in the exercise of a discretion, still they would not go to abrogate a vested right, only to the extent of the titles. But this question will be more particularly examined hereafter.
Suppose, on the common at Cincinnati, or on the vacant space connected with Water street at Pittsburgh, it had been proved that the state had constructed a custom-house, or temporary barracks, would such acts have been considered as disproving a dedication. Clearly they would not; nor would grants for one or two lots within either space, unadvisedly issued and in derogation of vested rights, have been so considered.
The title to Penn and his heirs was allodial, and we have seen *717] *that the Western Company was authorized to make such titles. Like the heirs of Penn, the Western Company was proprietor of a great extent of territory, and the dedications were made under circumstances somewhat similar; but the proof of dedication of the common or quay at New Orleans, is incomparably stronger than was found in the Pittsburgh case.
It appears that this quay has been greatly enlarged, by the alluvial formations of the Mississippi river; and from this fact an argument is drawn against the right of use in the city, at least to the extent asserted.
The history of the alluvial formations by the action of the waters *571 of this mighty river, is interesting to the public, and still more so to the riparian proprietors.
The question is well settled at common law, that the person whose land is bounded by a stream of water, which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded, is subject to loss, by the same means which may add to his territory: and as he is without remedy for his loss, in this way, he cannot be held accountable for his gain.
This rule is no less just when applied to public, than to private rights. The case under consideration will illustrate the principle.
If the dedication of this ground to public use be established by the principles of the common law, is it not of the highest importance that the accumulations of the vacant space, by alluvial formations, should partake of the same character and be subject to the same use as the soil to which it becomes united?
If this were not the case, by the continual deposits of the Mississippi, the city of New Orleans would, in the course of a few years, be cut off from the river, and its prosperity impaired. If the city can claim the original dedication to the river, it has all the rights and privileges of a riparian proprietor.
But there is another consideration of great weight on this subject. It appears that the city, from time immemorial, has been compelled to construct at great expense, and keep in repair, levees, which resist the waters of the river and preserve the city from inundation. If it were not for these levees or embankments, it appears from the facts proved, that not only the city of New Orleans, but the country, to a great extent, bordering on the lower Mississippi, would be *uninhabitable. [*718 These works resist the current of the river; eddies are formed, and the deposits rapidly accumulate. In this way has the vacant space been greatly enlarged within twenty or thirty years past.
This enlargement of the quay cannot defeat or impair the rights of the city; and the question only remains to be answered, whether the facts in this case, by the principles of the common law, show a dedication of this vacant space to public use.
No one can doubt, that the answer must be in the affirmative.
The original dedication is proved by the maps in evidence, and by a public use of more than a century. These facts are conclusive. The right of the city is sanctioned by time, and established by uncontroverted facts.
No case of dedication to public use has been investigated by this court, where the right has been so clearly established.
What effect the acts of the federal government, and the acts of the corporation of the city may have upon this right, will be considered in another branch of this case.
As the rights claimed by the city had their origin under the laws of France, and were enjoyed for nearly forty years under the laws of *572 Spain, it becomes necessary to examine those laws, to ascertain the nature and extent of these rights. On this ground the claims of the city have been earnestly and ably, if not confidently resisted, in the argument. The laws of France and of its colonies, it is admitted, prevailed in Louisiana from its first settlement until the 25th November, 1769, when they were abrogated by O'Reilly, captain-general under the king of Spain.
On the part of the defendants in error, it is contended, that the corporation of the city has no title whatever to the soil, or to the use of the premises in question: and great reliance is placed on a decision lately made by the supreme court of Louisiana, in the case of C.G. De Armas and M.S. Cucullu v. The Mayor, Aldermen, &c. of the city of New Orleans. Two of the three learned judges who compose that court lay down principles, in their opinions in that case, which are inconsistent with the right asserted by the city in this case: and it is insisted that this decision, which disaffirmed the right set up by the city, is conclusive on this court.
So far as the present controversy may be supposed to arise under the laws of the United States, or the treaty of cession, it is clear that the decision of the Louisiana court cannot be considered as settling the question. In the argument on behalf of the government, *719] *the principle is laid down, that by the laws of France, a city or town could not acquire a right or title to the soil of immovables, or to the use of them, without letters patent from the king. And Domat, with other authorities, is referred to, who, in treating of communities, declare, as a primary rule, that they should be established for the public good, and by order or permission of the prince.
By the third section in the statement of facts, it appears that towns in the French colonies, were never incorporated like those of the United States; they are founded in virtue of orders emanating from the government, or from the minister of marine, and transmitted to the governors of the colonies, and their administration was confided to intendants, who had authority to enact the necessary public regulations.
It is insisted that no reasons are assigned why the law of France was not complied with, by issuing a grant, if the dedication of this common was in fact made. That the plan of the town may be presumed to have been made, and the ground in contest designated, as appears on the maps, for other purposes than those supposed by the city authorities. That the maps were for a long time lost sight of, and could not have been considered as evidence to supply the place of a grant: had this been the case, they would have been preserved with care. But the most conclusive argument against this dedication is, it is said, that until the town was incorporated by letters patent, it was incapable of taking by grant. And the decision of the supreme court of Louisiana is referred to as sustaining this doctrine.
Great respect is due to the opinions of the two learned judges who made this decision; and especially on questions arising under the civil law, with the principles of which they must be familiar *573 Still it would seem that a ready answer may be found to at least some of the objections stated by the counsel. In the first place, the dedication of this common was made by the Western Company, who had power to make grants; and ignorance of their rights, by the inhabitants of the city, or of the necessary evidence to establish them, affords no very satisfactory proof against the existence of those rights. And, if reasons can be assigned, why this ground was designated on the plat as a quay, which show that such endorsement could not have been designed as a substitute for a grant; yet, in the absence of satisfactory reasons, is it not fair to presume in favour of a servitude which has been enjoyed by the city for more than a century?
*Whether the retrocession of Louisiana, its jurisdiction, [*720 &c., by the Western Company to the king of France, could affect the rights previously granted by it, may be hereafter considered.
It is admitted that the power of the sovereign over the streets of a city, is limited. He cannot alien them, nor deprive the inhabitants of their use, because such use is essential to the enjoyment of urban property. And a distinction is drawn, in this respect, between the streets of a city and other grounds dedicated to public use. The latter, it is contended, is not only under the supervision of the king, as to its use, but he may sell and convey it.
Now, it would seem, in reason, that the principle is the same in both cases. The inhabitants of a town cannot be deprived of their streets, as the streets are essential to the enjoyment of their property. In other words, by closing the streets, the value of the buildings of the town would be greatly reduced, if not entirely destroyed. And if ground dedicated to public use, which adds to the beauty, the health, the convenience, and the value of town property, be arbitrarily appropriated by the sovereign to other purposes, is not the value of the property, which has been bought and sold in reference to it, greatly impaired? The value may not be reduced to the same ruinous extent, as it would be to close the streets, but the difference is only in the degree of the injury, and not in the principle involved.
Domat, liv. 1, title 8, sec. 1, art. 1, says, there are two kinds of things destined to the common use of men, and of which every one has the enjoyment. The first are those which are so by nature; as rivers, the sea, and its shores. The second, which derive their character from the destination given them by man; such as streets, highways, churches, market-houses, court-houses, and other public places; and it belongs to those in whom the power of making laws and regulations in such matters is vested, to select and mark out the places which are to serve the public for these different purposes."
But, it is said, if the dedication was made by the king, the citizens of New Orleans, or the public, did not acquire a right paramount to his. And that having a right to regulate the use, and the fee never having been conveyed by him to the city, by grant or otherwise, he must of course retain the power of disposing of the property.
*574 The right of the king to this property, is compared to the right of a city, which is vested with the fee and the use; and as in such case the corporation may dispose of the property dedicated, with *721] the *sanction of the sovereign power, the sovereign, it is contended, having the right of property and the power to regulate the use, may alien.
And it is said, that this supervision of the use by the king, was a doctrine peculiarly applicable to Louisiana and the city of New Orleans, where the changes are so frequent by the continual formations on the shores of the Mississippi, in addition to increase of population and business, which often require alterations in the streets and other public places.
Though certain places may be dedicated to public purposes by the supreme power, and may be said to be withdrawn from commerce, still it is insisted where no grant has been made, and private rights have not become vested in the property, it is not withdrawn from the sovereign power.
This argument goes upon the fact, that the title to the quay remained in the king of France, which is a controverted point.
That the king, under the law of nations, was entitled to the right of soil of Louisiana, is not contested. The same rights belonged to the sovereign of France in this respect, as have been accorded to other European sovereigns who made discoveries on this continent; but the conclusion which is drawn from this, that, as no grant was given, the king had a right to alien the ground in contest, the same as any other part of Louisiana, is not admitted.
This argument in behalf of the power of the king of France over the common, is founded upon the supposition, that the cession of the country to the king by the Western Company, destroyed the rights which had become vested under it; and also, that as no grant for the land in contest has been proved, none can be presumed.
The doctrine of presumption is as fully recognized in the civil as it is in the common law. It is a principle which no enlightened tribunal, in the search of truth, and in applying facts to human affairs, can disregard.
The retrocession of Louisiana to France by the Western Company, did not abrogate the rights which had been acquired under it. All the grants to individuals made by the company were respected; and there is no act by the French government, from the foundation of the city to the transfer of the country in 1769, to Spain, which shows that this dedication was not as much respected and sanctioned by the king, as were the grants to private citizens. Does not this long acquiescence of the monarch, and enjoyment of the property by the city, *722] afford some evidence of right? But in addition to this *consideration, it appears in evidence, that from the time the plan of the city was adopted until the country was ceded to Spain, numerous transfers of property were made, in which the property is described as being bounded by this quay; and also, many official transactions of public officers, in which the quay is recognized and *575 referred to. This shows in what light this vacant space was considered by the public, for nearly fifty years after the dedication was made: and it is not probable that this subject could have been wholly overlooked by the king. The plan of the city, containing the designation of this quay, was published by Charlevoix in his Histoire de la Nouvelle France, and perhaps by Voltaire. It is true, that New Orleans contained at this time a very limited population; but it is matter of history, that not many years after the foundation of the city was laid, the most splendid scheme of commercial enterprise, connected with banking operations, was projected in France, in reference to Louisiana. So excited did the public mind become on this subject, and so generally was the public attention directed to it, that there is little probability the dedication of this common could have escaped the notice of the king of France. It was not, probably, deemed too large for the accommodation of a city which was to become the emporium of a country of such vast resources.
The public use of this common for so great a number of years, and the general recognition of it from the time it was dedicated, in numerous private and official transactions, and the acquiescence of the French king, offered no unsatisfactory evidence of right. If a grant from the king were necessary to confirm the claim of the city, might it not be presumed under such circumstances?
But suppose the dedication had not been made by the Western Company, and the title were admitted to be in the king, as decided by the supreme court of Louisiana; is it clear that he had the power to alien the ground at pleasure?
It cannot be insisted that the dedication of this property to public use, whether the title to the thing dedicated became vested in the city or its use only, could withdraw it from the political jurisdiction of the sovereign power. This would place property of this description on a higher and more sacred principle than private property. But in no point of view can this be the case.
That a jurisdiction to a limited extent was exercised by the king of France over the quays of Paris and the public grounds of other cities in the kingdom, such as permitting buildings to be constructed *thereon and regulating the manner and extent of such occupancy, [*723 is admitted; but this power seems to have been in the nature of a police regulation, and was so exercised as was not incompatible with the public use of the grounds. This authority, however, does not prove that the fee or the right of use was not in the public, or that the king had power to convey the lands.
Domat says, "rivers, their banks, highways, are public places which are for the use of all, according to the laws of the country. They belong to no individual and are out of commerce; the king only regulates the use of them." And again, in vol. 2, lib. 1, tit. 8, sect. 2, 3, and 16: "we class public places, as out of commerce; those which are for the use of the inhabitants of a city, or other place, and in which no individual can have any right of property, as the walls, ditches or gates of a city, and public squares."
*576 In Domat, b. 1, tit. 8, sect. 2, art. 19, it is said: "if it should happen that some buildings on a public square should be constructed, they might either be demolished if they should prove any way hurtful or inconvenient, or be suffered to stand upon condition of their paying a rent, or making some other amends to the public, if found to be more advantageous to let them remain, either because they would be an ornament to a market place, or other public place, or because of the rent they would yield, or other advantages that might be made of them.
Judge Martin, who dissented from the opinion of the superior court in the case above cited, says, "of public places, the public may claim the use by exhibiting evidence of a dedication to its profit, by the sovereign or pater families, without any letters patent, grant or deed."
And "of places which are alleged to be the exclusive property of the town or city, or of which the exclusive right to use is claimed, letters patent, a grant, or deed, must be produced.
The power of appropriating private property to public purposes is an incident of sovereignty. And it may be, that by the exercise of this power, under extraordinary emergencies, property which had been dedicated to public use, but the enjoyment of which was principally limited to a local community, might be taken for higher and national purposes, and disposed of on the same principles which subject private property to be taken.
In a government of limited and specified powers like ours, such a power can be exercised only in the mode provided by law; but in *724] an *arbitrary government, the will of the sovereign supersedes all rule on the subject.
But it must be admitted that while the French laws and usages may show the nature and extent of the right of the public to this common, as it was originated and regulated by them, for nearly half a century; yet it is to the Spanish laws and usages we must chiefly look in determining this head of the controversy.
From the abrogation of the French laws in Louisiana by O'Reilly in 1769, until the country came into the possession of the United States, the laws of Spain acted upon and governed the rights in controversy. The retrocession of the country from Spain to France, and the cession of France to the United States followed so soon afterwards, that these transfers, it is admitted, caused no interruption to the laws of Spain.
Louisiana was ceded by France to Spain without any abridgment of the vested rights to property enjoyed by private individuals or communities. The rights of the city of New Orleans were in no respect affected by this cession, unless they have been affected by the action of the Spanish laws; and we will now examine this point.
The fundamental laws of the Spanish nation, and which are understood to be alike binding on the king and the people, are found in the Partidas and the Recopilacion.
The 9th law, tit. 20, of Partida 3, contains the following: "the *577 things which belong separately or (severally) to the commons of cities or towns are fountains of water, the places where the fairs or markets are held, or where the city council meet, the alluvions or sand deposits on the banks of rivers, and all the other uncultivated lands immediately contiguous to the said cities, and the race grounds, and the forests and pastures, and all such other places which are established for the common use."
The 23d law, tit. 32, of Partida 3, is as follows: "no one ought to erect a house or other building or works in the squares, nor on the commons, (exidos) nor in the roads which belong to the commons of cities, towns, or other places; for as these things are left for the advantage or convenience and the common use of all, no one ought to take possession of them, or do, or erect any works there for his own particular benefit; and if any one contravenes this law, that which he does there must be pulled down and destroyed; and if the corporation of the place where the works are constructed choose to retain them for their own use, and not pull them down, they may *do [*725 so; and they make use of the revenue they derive therefrom in the same manner as any other revenues they possess; and we moreover say, that no man who has erected works in any of the above mentioned places can or shall acquire a right thereto by prescription."
In the Recopilacion, law 1, b. 4, tit. 15, is the following: "whereas, in our kingdoms, persons hold and possess some cities, towns, villages, and civil and criminal jurisdiction, without any title from us, or from the kings, our predecessors; and it has been doubted whether the same could be acquired against us and our crown by any time: we do ordain and command, that immemorial possession, proved in the manner, and under the conditions required by the law of Toro, which is law the 1st, tit. 7, b. 5, of this Recopilacion, be sufficient to acquire against us, and our successors, any cities, towns, villages, use, or jurisdiction, civil or criminal, and thing or part thereof annexed, or belonging thereto. Provided, that the time of said prescription be not interrupted by us, or by our command, naturally or civilly. But the supreme, civil, or criminal jurisdiction which kings have, by their sovereignty and kingly power, which consists in exercising and having justice done, when other lords and judges do not; we do ordain, that this cannot be acquired or prescribed by the said time or any other; and likewise what the laws say cannot be acquired by time, must be understood of the imposts and tributes coming to or owing to us."
And again, Recopilacion, law 1, tit. 7, b. 5, is the following law; "we do ordain, that the mayorazgo, [mayorat of the French, entail in English,] may be proved by the instrument of its institution, together with the written permission of the king who authorized it: provided the said instruments are authenticated; or by witnesses, who testify in the form required by law, to the tenor of the same, and likewise by immemorial custom proved, establishing that the former possessors have held and possessed the property or mayorazgo; that is to say, *578 that the eldest legitimate sons and their descendants used to inherit said property, as such, when the holder thereof left other son or sons, without leaving them any thing equivalent to what those who succeeded to the mayorazgo received; provided the witnesses be of good reputation, and declare that they have seen it thus for forty years, and heard their seniors say that they always saw it, and never heard the contrary said, and that it is a matter of public voice, *726] *notoriety, and opinion, amongst the inhabitants or residents of the place."
In the Novissima Recopilacion, b. 7, tit. 16, law 1, is the following: "our pleasure and will is, to preserve their rights, rents, and property to our cities, towns, and places, and not to make any gift of any thing of them; wherefore we command that the gift or gifts which we may make, or any part of them, to any person whatsoever, are not valid."
A faithful observance of these laws would have preserved the rights of the city, as to the common, free from invasion. No law was cited in the argument which showed the power of the king of Spain to alienate land which had been dedicated to the public use; and it is clear that the exercise of such a power would have violated the public law, which is understood to have limited the exercise of the sovereign power in this respect.
The king of Spain, like the king of France, had the power to give permission to construct buildings on grounds dedicated to public use, without injury to the public rights; but this does not show that either sovereign had the power to alien such lands.
In the 3d Partida, law 3, tit. 32, the sovereign was authorized to grant permission to build on public places. And the comment of Rodriguez, 15 and 16, is, that the building must be so constructed that no one should be injured on his right thereby; because the privileges granted by princes are understood to be granted without prejudice to third persons.
On the 22d February, 1770, O'Reilly, governor, &c., of Louisiana, published an ordinance, in conformity to law, "to designate city properties and rents belonging to the city of New Orleans;" and among other regulations, "six dollars were required to be paid by each boat of the tonnage of two hundred tons, &c., for right of anchorage, established and destined to the keeping in repair of the levee or dike, which does contain the river within its limits, in the whole front of the city, &c." This regulation was to continue during the pleasure of his majesty.
As power was given to the king of Spain, by law, to grant permission to build on public places, it would seem to follow, that such places were not only withdrawn from commerce, but that the king could not alien them. For if he had the power to do this, in as unlimited a manner as over the crown lands, it would include the exercise of every minor authority over them. If he could sell and *727] *convey the lands dedicated to public use, surely he might, without any authority of law, grant permission to build on such land.
*579 But, as it appears from the evidence in this case, that permission was not only given to construct buildings on this common, but that a part of it was granted in fee, it is contended that this is evidence of the king's power, not only to regulate the use of this common, but to convey it in fee. And the leading case of Arredondo, 6 Peters, 691, is referred to, as sanctioning the principle, that a grant, issued by a Spanish functionary, is not only evidence of title, but also that the officer had the power to issue it.
In that case this court did hold, and the same principle has been sanctioned in numerous cases since, that a grant should be considered as prima facie evidence, that it was rightfully issued; but that it might be impeached by any one who set up an adverse claim.
We will examine the grants made, under Spanish authority, to any part of this common, and other acts of jurisdiction over it exercised by the government of Spain, which have been proved by the evidence.
On the 14th of June, 1792, Carondelet, governor, intendant, &c., granted to Liotaud, a lot of ground situated within this common; and in the grant he says, "making use of the power which the king has vested in us, we grant in his royal name," &c.
And on the 10th August, 1795, another grant was made of a lot in the common to Mentzinger, by the same governor.
In 1793, Arnaud Magnon, a master carpenter, represented, by petition to the governor and intendant-general, that he had built a barge for the public, and as a compensation therefor, he asked eighteen or nineteen feet on one side of his house to enlarge it, the same being very small, and that the same was granted to him, but that he had no instrument of writing as evidence of the same, and which he solicits.
And he also represented to the intendant-general, that his dwelling-house having been included in the conflagration of 1788, that Governor Miro permitted him to construct a small house near the river, "on the inner side of its dike," and in consequence of this misfortune, and his having built a barge, &c. a small portion of land of eighteen to nineteen feet adjoining his house, had been granted to him. That he was afterwards allowed to build a shed for the convenience of ship buildings, &c., and he prays that a title may be granted to him for the lot.
*This petition was submitted to the attorney-general, who [*728 reported that it appeared to him, "it would be an act of injustice to refuse the petitioner the corresponding titles of property that he solicits;" for, "although the council of this city might have some objection, on account of the said lot being situated within its precincts, this opposition may be easily overcome, by the certainty that if Magnon did not occupy the said lot, it would be necessary that another should occupy it, owing to the necessity and usefulness of said shipyard to the public."
It does not appear that this claim was ever carried into grant by the Spanish authorities.
In 1783, on the petition of Etienne Planche, who represented himself to be a carpenter and calker, and having much work which he *580 could not do in his yard, &c., he asked permission to build a shed in front of his house, which was not to be closed, &c. This leave was given, and he, and those claiming under him, occupied the ground for many years, but no grant was ever obtained from the Spanish governor for the lot.
Catharine Gonzales, widow of Bertrand, set up a claim; and it appears that on the petition of her former husband he was permitted to rebuild his house on the common, which had fallen into decay, which was allowed by the governor, &c. But no grant was ever issued by the Spanish authority for this lot.
These permissions to build were given by the governor and intendant, under the law, which has been cited, that authorized the sovereign to grant permission to construct buildings on the public grounds.
This was not considered inconsistent with the public use, as the power was not to be exercised to the prejudice of third parties.
The three lots for which grants were issued, it must be admitted, under the circumstances, is such a final disposition of the property as is wholly incompatible with the public right. For the fee of these lots was not only granted, but also the use.
This transfer of the fee, it is contended, affords conclusive evidence that the title to the common remained in the king, and having, in addition to this, the power to regulate its use, he could alien it at pleasure.
If this power was possessed by the king, why was the authority given, in the law which has been stated, to grant permission to construct buildings on public grounds? This power, as appears from *729] *the record, was exercised over the common in controversy, and only in three instances were lots granted absolutely. In the case of the Mayor, &c., of New Orleans v. Bermudez, decided by the supreme court of Louisiana, 3 Martin 309, the court say, "however contradictory these expressions may appear to be, the worst conclusion which can be drawn therefrom against the city of New Orleans is, that they had not that kind of possession which is the consequence of an absolute right of ownership. Yet the sovereign having never thought fit to exercise any further right over these commons, and the claim of the city to them having been recognized and confirmed by the successor of that sovereign, the inhabitants of New Orleans must be considered as having never ceased to be the rightful possessors of that land," &c.
And in the same book, 303, the court say, "in the year 1795, the Baron Carondelet, then governor of Louisiana for the king of Spain, granted to Henry Mentzinger, the appellee, a lot of ground, situated in the city of New Orleans, close to the levee, &c.
"But the appellants contend, that the spot on which it is located is part of the public highway, and, therefore, could not have been lawfully granted for private use, even by the king himself.
"That public places, such as roads and streets, cannot be appropriated to private uses, is one of those principles of public law, which required not the support of much argument. Nor is there *581 any doubt, that if, by a stretch of arbitrary power, the preceding government had given away such places to individuals, such grants might be declared void.
"But is this grant located in a street, or on the public road? On this important question of fact, the evidence, produced by the appellant, is `by no means satisfactory.' They show, that according to general usage in this country, the public road in front of the river is close to the levee. But could there be no derogation from that usage? Was that usage observed within the city of New Orleans? Does not the convenience of placing markets and other public places as near the water as possible, as it is recommended by the law of the Indies, make it necessary to deviate from such usages in cities?
"General usage, however, is the only ground on which the appellants rest their pretensions. No plan of the city has been exhibited, to show that the lot of the appellee is located upon a place which had been reserved for public use; no testimony has been adduced to prove, that this spot is part of the ground laid out for the *public road. We are called upon to declare this grant void, [*730 merely because the general usage of the country is to place the road next the levee."
From this opinion it would seem, that if there had been satisfactory proof before the court, that the ground in controversy had been appropriated to public use, the decision, instead of being favorable to the grantee, would have been against him.
There can be no difference in principle, between ground dedicated as a quay to public use, and the streets and alleys of a town: and as to the streets, it may be asked, whether the king could rightfully have granted them. This will not be pretended by any one. And it is believed, that the public right to a common, is equally beyond the power of the sovereign to grant: unless he dispose of it under the power to appropriate property to the national use; and then compensation must be paid.
The grant to Liotaud was also contested by the city authorities; but it was decided against them on a ground which did not embrace the merits of the claim, on the part of the city, as now presented.
In speaking of this case, Mr. Justice Martin, in his able and learned opinion in the case of De Armas and Cucullu v. The Mayor of New Orleans, &c., says: "in Liotaud's case, the then plaintiffs laboured under the inability to establish the appropriation to the public use, by the founder of the city of New Orleans, of the space which separates the first row of houses from the Mississippi.
"The appellants stated their ability to establish that, immediately after the grant; murmurs had been excited; and the inalienability of any part of the space having been tenaciously insisted on, the governor had revoked his grant, and indemnified the grantee, by the concession of the lot on one of the streets: but the court decided the testimony was inadmissible, and the witnesses were not heard."
"Magnon," the same judge remarks, "was a ship-builder, and *582 the ship yard was between the levee and the water. The governor, deeming the builder's residence near it necessary to the public service, allotted him a space of ground to live on near the yard, but on the opposite side of the levee. The question arising out of this grant was not litigated; the city agreeing to compensate Magnon for the relinquishment of his claim." This lot, however, though a part of the ground alleged to have been dedicated to public use, is not within the common or quay contested in this case.
And it appears from the above opinion, that to prevent any other titles being made for any part of the common, certain proceedings *731] *were instituted by the attorney-general, at the instance of the city authorities, which prevented the emanation of any other grants for any part of the quay, until the country was ceded to the United States.
From a careful examination of the jurisdiction exercised over this common by the governments of France and Spain, and the laws which regulated this description of property in both countries, the conclusion seems not to be authorized, that it was considered as a part of the public domain or crown lands, which the king could sell and convey. This power was not exercised by the king of France, and the exercise of the power by the Spanish governor in the instances stated, was in violation of the laws of Spain, and equally against its usages.
The land, having been dedicated to public use, was withdrawn from commerce; and so long as it continued to be thus used, could not become the property of any individual. So careful was the king of Spain to guard against the alienation of property which had been dedicated to public use, that in a law cited, all such conveyances are declared to be void.
It would be a dangerous doctrine to consider the issuing of a grant as conclusive evidence of right in the power which issued it. On its face it is conclusive, and cannot be controverted; but if the thing granted was not in the grantor, no right passes to the grantee. A grant has been frequently issued by the United States for land which had been previously granted; and the second grant has been held to be inoperative. And in a case recently decided by this court, where the government had granted land in the state of Ohio, as land belonging to the United States, which was found to be within the Virginia reservation in that state, to satisfy certain military claims, it was held, that the title did not pass under the grant. If then, the common in question had been dedicated to public use so as to withdraw it from commerce, and so vest the title in the public as to preserve it from alienation by the king, the grants issued for the lots stated, cannot affect the right of the public, at least beyond the limits of those grants.
That both the kings of France and Spain could exercise a certain jurisdiction over this common, and other places similarly situated, has been stated; but this was a police regulation, and was rightfully *583 exercised in such a manner as not to encroach upon the public use. This seems to be the result to which a careful examination of the laws and usages of both countries must lead us.
*We come now to examine under the third head, the interest [*732 of the United States in the property claimed by the city, and their jurisdiction over it.
The first article of the treaty of cession is as follows: "whereas, by the article the third of the treaty, concluded at St. Ildefonso the 1st October, 1800, between the first consul of the French republic and his catholic majesty, it was agreed as follows: his catholic majesty promises and engages, on his part, to retrocede to the French republic, six months after the full and entire execution of the conditions and stipulations herein relative to his royal highness the duke of Parma, the colony or province of Louisiana, with the same extent that it now has in the hands of Spain, and that it had when France possessed it, and such as it should be after the treaties subsequently entered into between Spain and other states." And in behalf of the French republic, the first consul ceded, "for ever and in full sovereignty, the said territory, with all its rights and appurtenances, as fully and in the same manner as they have been acquired by the French republic," &c.
And in the second article it is declared, that in the cession "are included the adjacent islands belonging to Louisiana, all public lots and squares, vacant lands, and all public buildings," &c.
Under this treaty Louisiana was ceded to the United States in full sovereignty, and in every respect, with all its rights and appurtenances, as it was held by the republic of France, and as it was received by that republic from Spain. And it is insisted, that the same rights of jurisdiction and property which appertained to the sovereign of Spain, under its laws and regulations, were, by the treaty, transferred to the United States: and that whether this right extends to the fee of the property in contest, or the regulation of its use, it is contended that this court must take jurisdiction of the case, and restrain the city authorities from selling any part of it.
To show that the federal government has considered this common as a part of the public domain, under the treaty, various laws of congress have been referred to, and official proceedings by the agents of the government, in reference to it; and also it is shown, that the action of the government has been solicited by the city authorities, who, by these acts, it is insisted, have acknowledged the right of property to be in the United States, as asserted in their behalf by the district attorney of Louisiana. We will refer more particularly to those acts.
*On the 26th March, 1804, congress passed an act, [*733 "erecting Louisiana into two territories, and providing for the government thereof;" in the fourteenth section of which it was provided, that all grants for and within the territories ceded by France, the title of which was, at the date of the treaty of St. Ildefonso, in the *584 crown, &c. of Spain, were declared to be null and void." Provided, nothing in the section was to make void any bona fide grant, agreeably to the laws, usages, &c. of the Spanish government. An act entitled "an act for ascertaining and adjusting the titles and claims to land, within the territory of Orleans, and the district of Louisiana," was passed on the 2d March, 1805. This act, after specifying what titles under the Spanish government should be held valid, and requiring the evidence of title to be exhibited, &c. authorized the appointment of a register, who, with two commissioners to be appointed, were to constitute a board for the decision of land claims in the territory, &c.; and their report was required to be laid before congress, &c. And by an act of the 3d March, 1807, it was provided, "that the claim of the city of New Orleans to the commons adjacent to said city, and within six hundred yards of the fortifications of the same, be, and the same is hereby recognized and confirmed: provided, that the corporation shall, within six months after passing this act, relinquish and release any claim they may have to such commons beyond the distance of six hundred yards aforesaid," &c.
Other acts were passed in relation to land claims in the district, which it cannot be necessary to notice.
Arnaud Magnon, whose claim has been before referred to, applied to the commissioners under the above act to report on land titles, &c., who reported: "we know of no law or usage of the Spanish government respecting claims similarly situated: but think it highly probable, that had the claimant applied he would have obtained a grant for it, as a grant was made to a lot of ground adjoining him under no higher pretensions. Nor does this appear to come within any of the provisions of the laws of the United States, although there have been ten consecutive years' possession; the land has not been inhabited or cultivated. This part of the claim we do not feel ourselves authorized to decide on; but are of opinion, that, in justice, the claim ought to be confirmed."
And, on the claim of John J. Chessé, the commissioners report, that "they did not feel authorized to make any decision on the claim; *734] *but they thought it would be more an act of justice than generosity if the government should confirm it."
A similar report was made on the claim of Catherine Gonzales and Peter Urtubuise. Their claims were for lots of ground within the common: and they have been confirmed by acts of congress; and patents have been issued to the claimants.
The claim of the city to the commons was presented by P. Derbigny and L.S. Kerr; who were duly authorized to present it in behalf of the city. And the commissioners reported: "that the claim was in part settled by the acts of congress of 1807 and 1811; which confirm to the corporation six hundred yards from the fortifications of the city; but which are, nevertheless, embraced by the claim aforesaid. That they had in vain searched in the documents to which they were referred for proof of even a shadow of title to this land. *585 That there was no evidence of it ever having been granted or considered as belonging to the city, either by the French or Spanish government. The board, therefore, rejected the claim."
On the 3d of April, 1812, congress "passed an act granting to the corporation of the city of New Orleans the use and possession of a lot in the said city."
By this act the city "was authorized to use, possess, and occupy the same, for the purpose of erecting, or causing to be erected and kept in operation a steam-engine or engines for conveying water into the said city; and all buildings necessary to the said purpose: provided, that if the space of ground shall not be occupied for the said purpose within the term of three years from and after the passing of this act, or shall, at any time thereafter, cease to be so occupied for the term of three years, the right and claim of the United States thereto shall remain unimpaired."
And by an act of the 30th of March, 1822, "the corporation of the city of New Orleans was authorized to appropriate so much of the lot of ground on which fort St. Charles formerly stood, as may be necessary for continuing Esplanade street to the Mississippi river; and, also, to sell and convey that portion of the said ground which lies below said street," &c.
By the act of the 20th of April, 1818, congress authorized the president to abandon the use of the navy arsenal, military hospital, and barracks in the city of New Orleans; and, after laying off the ground into lots, to sell them at public sale, &c. And he was authorized to cause the fort St. Charles to be demolished, and the navy yard in the *city to be discontinued; and the lot of ground on which the [*735 fort stood was appropriated to the use of a public square, to be improved as the corporation of the city should think proper. These acts related to lots within the common of the city; though but few of them are included in that part of the ground respecting which this suit was commenced.
These official acts of the federal government, by legislation and otherwise, respecting the common claimed by the city, and some of which were induced by the special application of the corporation, afford strong evidence, it is contended, not only of the right of the United States to the property in question, but that such right was fully recognized by the corporation.
It must be admitted, that several of these acts are unequivocal in their character, and do show, as contended by the attorney-general, an admission, on the part of the city, not only that congress had a right to legislate on this subject, but also to dispose of certain parts of the common in fee. And these acts, if unexplained, do strengthen the argument against the claim set up by the city.
It is a principle sanctioned as well by law as by the immutable principles of justice, that where an individual acts in ignorance of his rights, he shall not be prejudiced by such acts. And this rule applies at least with as much force to the acts of corporate bodies, as *586 to those of individuals. We will, therefore, inquire, as we are bound to do, whether, under the circumstances of this case, the acts of the city can, justly, be considered as prejudicing the claim which they assert.
In the first place, the fact that when we obtained possession of Louisiana, the city of New Orleans was composed of citizens who, in their language, habits of thinking, and acting, were almost as dissimilar from other parts of the United States, as if they had inhabited a different continent, is of great importance; and, above all, they were unacquainted with the nature of our government, in a great degree, and the principles of our jurisprudence.
They may be supposed to have been acquainted with the civil law, and to some extent, at least, with their rights as recognized and sanctioned by the laws and usages of Spain.
It is well known that the policy of Spain in regard to a disposition of her public domain, is entirely different to that which has been adopted by the United States. We dispose of our public lands by sale; but Spain has uniformly bestowed her domain in reward for *736] *meritorious services, or to encourage some enterprise deemed of public utility.
That a community, composed, as were the citizens of New Orleans, almost entirely of foreigners, and under the circumstances which existed, should have mistaken their rights, is not extraordinary. Indeed, it would have been a matter of surprise if they had, under the new system, understood the extent of their claim. They did exhibit their claim to the commissioners, who rejected it. And this, no doubt, induced the corporation to make the applications to congress which have been noticed.
But in addition to the consideration, that the city authorities probably acted in ignorance of their rights, it may be safely assumed, that they had not the power, by the acts referred to, to divest the city of a vested interest in this common.
We come now to inquire whether any interest in the vacant space in contest, passed to the United States under the treaty of cession.
In the second article of the treaty, "all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices, which are not private property," were ceded. And it is contended, as the language of this article clearly includes the ground in controversy, whether it be considered a public square or vacant land, the entire right of the sovereign of Spain passed to the United States.
The government of the United States, as was well observed in the argument, is one of limited powers. It can exercise authority over no subjects, except those which have been delegated to it. Congress cannot, by legislation, enlarge the federal jurisdiction, nor can it be enlarged under the treaty-making power.
If the common in contest, under the Spanish crown, formed a part of the public domain or the crown lands, and the king had power to *587 alien it, as other lands, there can be no doubt that it passed under the treaty to the United States, and they have a right to dispose of it, the same as other public lands. But if the king of Spain held the land in trust, for the use of the city, or only possessed a limited jurisdiction over it, principally, if not exclusively, for police purposes, was this right passed to the United States under the treaty?
That this common, having been dedicated to public use, was withdrawn from commerce, and from the power of the king rightfully to alien it, has already been shown; and also, that he had a limited power over it, for certain purposes. Can the federal *government [*737 exercise this power? If it can, this court has the power to interpose an injunction or interdict to the sale of any part of the common by the city, if they shall think that the facts authorize such an interposition.
It is insisted that the federal government may exercise this authority, under the power to regulate commerce.
It is very clear, that as the treaty cannot give this power to the federal government, we must look for it in the constitution; and that the same power must authorize a similar exercise of jurisdiction over every other quay in the United States. A statement of the case is a sufficient refutation of the argument.
Special provision is made in the constitution, for the cession of jurisdiction from the states over places where the federal government shall establish forts, or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction.
The state of Louisiana was admitted into the Union, on the same footing as the original states. Her rights of sovereignty are the same, and by consequence, no jurisdiction of the federal government, either for purposes of police or otherwise, can be exercised over this public ground, which is not common to the United States. It belongs to the local authority to enforce the trust, and prevent what they shall deem a violation of it by the city authorities.
All powers which properly appertain to sovereignty, which have not been delegated to the federal government, belong to the states and the people.
It is enough for this court, in deciding the matter before them, to say, that in their opinion, neither the fee of the land in controversy, nor the right to regulate the use, is vested in the federal government; and, consequently, that the decree of the district court must be reversed, and the cause remanded with directions to dismiss the bill.
As it is not necessary, we do not decide on the right of the corporation to sell any part of the common, or to appropriate it in any other manner than as originally designated.
This cause came on to be heard on the transcript of the record from the district court of the United States for the eastern district of Louisiana, and was argued by counsel; on consideration whereof, it is *588 *738] *ordered, adjudged, and decreed, by this court, that the decree of the said district court in this cause be, and the same is hereby reversed and annulled. And this court, proceeding to render such decree as the said district court ought to have rendered in the premises, doth order, adjudge, and decree, that the bill of the complainant in this cause be, and the same is hereby remanded to the said district court of the United States for the eastern district of Louisiana, with directions to the said district court to carry this decree into effect.