IN THE

# SUPREME JUDICIAL COURT,

IN THE

# COUNTY OF YORK.

ARGUED APRIL TERM, 1846.

RICHARD BRADLEY *versus* AMOS DAVIS.

A protest of a bill or note, duly certified by a notary public, is made by statute (c. 44, § 12) legal evidence of the facts stated in it, " as to the notice given to the drawer or indorser in any court of law ; ' but it is not conclusive of those facts.

The protest ought to be specific, as to the mode in which the notices were given, by stating whether they were verbal or in writing ; and if in writing, whether the writing was delivered to the person or persons notified, or despatched by some other mode of conveyance ; and if the latter by what mode, and when sent, and to what place addressed. But if the protest be defective, the necessary facts may be supplied by other proof.

It is not essential to the validity of a notice, that it should be stated therein who was the owner of the note or bill, or at whose request the notice was given. When a notice is signed by a notary public, he is to be presumed to have been duly authorized by the holder of the bill or note, whoever he may be.

If notice of the non-payment of a note, though left at an improper place, be, nevertheless, in point of fact received in due time by the indorser, and so proved, or could from the evidence be properly presumed by the jury ; it is sufficient in point of law to charge the indorser.

If a witness has before him books, wherein daily entries of the transactions in a certain business are made, and the witness knows that they are the genuine books, and on that ground, only, believes that the facts are truly stated therein, but yet the books are not in his handwriting, nor were the entries made in his sight ; and on inspection of the books, he still has no recollection of the facts ; the testimony is inadmissible.

ASSUMPSIT upon a note of which the following is a copy : —

" $2292,96.                    " Boston, May 20, 1835.

" Value received, I promise to pay Amos Davis, or bearer, two thousand two hundred, and ninety-two $\frac{96}{100}$ dollars, at the Suffolk Bank, Boston, in two years, with interest annually.

" Witness, Samuel P. Dutton.    " Erasmus Holbrook. "

The note was indorsed by Amos Davis.

At the trial before WHITMAN C. J. the signatures were admitted; and the plaintiff, to show that Davis was liable as indorser, read in evidence the protest by Charles Hayward, as a Notary Public; a deposition of Hayward, taken by the plaintiff, Sept. 12, 1844, and another, also taken by the plaintiff, one year afterwards; the depositions of Boyden & Tucker; and the testimony of Leverett, who brought into Court the books of the Tremont House.

The report of the case states, that by the advice of the presiding Judge, and with the consent of the parties, the case was withdrawn from the jury and submitted to the decision of the whole Court. The Court were to draw all such inferences from the testimony, considered by the Court to be legally admissible, as a jury might do; and decide any questions of fact, arising out of the legal testimony, that a jury would be authorized to do; and render such judgment as they shall deem necessary to carry their decision into effect.

Here follows a copy of the protest: —

" Commonwealth of Massachusetts.    Suffolk, ss. Boston.

" On this twenty-third day of May in the year of our Lord one thousand eight hundred and thirty-seven.

" I Charles Hayward, Notary Public, by legal authority admitted and sworn, and dwelling in the city of Boston, at the request of Mr. Joseph P. Stickney of Concord, N. H. went with the original note of hand, of which the foregoing is a true copy, to the Suffolk Bank in this city, where the same was payable, and speaking with a clerk there presented said note, and requested payment according to the tenor thereof, the time therein limited and the days of grace having expired; whereto he replied, that the maker had no funds there to pay said note. I then duly notified the maker and indorser of the non-pay-

ment of said note. Wherefore I, the said Notary, at the request aforesaid, have protested, and by these presents do solemnly protest against the drawer of said note, indorser and all others concerned therein, for exchange, re-exchange, and all costs, charges, damages and interest, suffered and sustained, or to be suffered and sustained, by reason or in consequence of the non-payment of said note.

"Thus done and protested in Boston aforesaid, and my notarial seal affixed, the day and year last written.

[L. S.]                    "Charles Hayward, Notary Public."

A copy of the note was annexed to the protest.

The facts, considered by the Court to have been proved, so far as is necessary to understand the points considered by the Court, are to be found in the opinion.

Extracts from Hayward's deposition.

In reply to the 2d interrogatory of the plaintiff in the first deposition he says : "I have examined the paper" (the protest) "and find it to be in my handwriting. The statements in it are true."

*Interrogatory by Mr. Rowe, for defendant in the second deposition.* "When did you put "J. P. Stickney" there ?"(in the protest.)

*Answer by deponent.* "I presume it was about the time I gave my first deposition."

*Question.* "Who directed you to leave the notice ?"

*Answer by deponent.* "The person who left the note with me. He was a stranger to me. I mean to say, that I do not now recollect whether Mr. J. P. Stickney delivered the note to me, or employed some agent to do it."

In the first deposition.

*Interrogatory 1st by counsel for defendant.* "At the time you left the notice, did you know, that Davis resided at Bangor in Maine ?"

*Answer by deponent.* "I knew that he formerly resided there, but whether that was still his residence, I did not."

*Interrogatory 2d.* "Did you make any inquiries of any one as to his then place of residence ?"

*Answer by deponent.* " The instructions received from the holders, whether of this, I will not undertake to say, directed me no doubt to go there."

*Cross interrogation 3d.* " Did any one ever tell you, that Boston was the place of Mr. Davis' residence ?"

*Answer by deponent.* " Not to my recollection."

In the second deposition, taken also by the plaintiff a year after the first.

*To Interrogatory 3d, by the plaintiff.* " Was said Davis at the Tremont House at the time you left the notice for him, as you have stated ?"

*Answer by deponent.* " I was directed to leave the notice there upon the supposition, that he resided there."

*To plaintiff's 4th interrogatory.* " Did you not satisfy your own mind, that he was at the Tremont House at this time ?"

*Answer by deponent.* " I should not have left it there if I was not satisfied, that he was resident there."

*To plaintiff's 5th Interrogatory.* " Is it not your invariable custom to make inquiries in such cases, that are perfectly satisfactory to your own mind ? Have you, or not, any doubt, that Davis was at the Tremont House at that time ?"

*Answer by deponent.* It is my custom to do so. I have no doubt Davis was there at the time. I considered that his place of residence ; he might have been out of town for a day or two, that I do not know. I always ask if that was his place of residence."

*In answer to interrogatory by defendant.* " Did you make any inquiries of any one as to Davis' then place of residence ?"

*Answer by deponent.* " Not that I recollect, except at the Tremont House."

*By same.* " Of whom did you inquire ?

*Answer by deponent.* " I have no doubt of the man at the bar. I always consider him the proper person to inquire of. I leave many notices a year at public houses and always at the bar."

Bradley *v.* Davis.

*By same.* "Did any one ever tell you, that Boston was the place of Mr. Davis' residence ?"

*Answer by deponent.* "I have no doubt they did, or I should not have left my notice at the Tremont House. I think that my employer gave me directions to leave the notice at the Tremont House. I was told by the person who directed me to leave the notice, that Mr. Davis resided at the Tremont House."

*By same.* "Who directed you to leave it ?"

*Answer by deponent.* "The person who left the note with me. He was a stranger to me. I mean to say, that I do not now recollect whether Mr. J. P. Stickney delivered the note to me or employed some agent to do it."

*By same.* Has any thing occurred since giving your former deposition, to refresh your recollection, and if so, what ?"

*Answer by deponent.* "Nothing."

The case was argued by

*Bradley,* for the plaintiff — and by

*J. Shepley,* for the defendant.

The opinion of the Court was drawn up by

WHITMAN C. J. — The parties have agreed, that the Court instead of the jury, shall ascertain the facts legally proved in this case, and decide whether, according to the rules of law, the plaintiff is entitled to recover. This depends upon the question, whether the defendant as indorser of a note, was duly notified of its non-payment by the maker. The defendant's place of abode was at Bangor in this State. The note was payable at a bank in Boston ; and was put into the hands of Charles Hayward, who, according to his testimony, had been a Notary Public in that city for twenty-four years, in order that he might make a demand of payment at said Bank, and notify the indorser, the defendant, in case of non-payment. By his protest it appears that he demanded payment at said Bank without effect, and in due season, and he therein says, that he duly notified the indorser of the non-payment.

The statute of this State, c. 44, § 12, has provided, that such notarial certificate shall be legal evidence of the facts stated in it, "as to the notice given to the drawer or indorser, in any court of law." It is not said in the statute that such certificate shall be conclusive evidence of those facts; and it would seem, if it should be taken to be conclusive, that it ought to be specific, as to the mode in which the notices were given, by stating whether they were verbal or in writing, and, if in writing, whether the writing was delivered to the person or persons notified, or despatched by some other mode of conveyance; and, if so, by what mode, and when sent, and to what place addressed. But if it be considered that the certificate is defective, the necessary facts may be supplied *aliunde.* In this case we have the testimony of the notary, contained in two depositions, detailing the particulars of what he did by way of giving notice to the defendant, in which he seems to have undergone a very close and rigorous cross-examination by the counsel of the defendant. And his credibility, in argument, is vehemently assailed upon the ground, that there are discrepancies in his statements. But we cannot doubt, that a man, who has held so responsible a station as that of a notary public, in the city of Boston, for twenty-four years, and whose general character for truth and veracity is not directly impeached, must be a person entitled to some consideration and respect; and the discrepancies pointed out are of a character such as might arise from lapse of time, impairing the distinctness of recollection, and be produced in some measure by the rigor of the cross-examination. As to the facts, essential in the cause, and to which his attention would be more naturally engaged, we do not feel at liberty to withhold our credence to the correctness of his statements. The notice, he says, was given in writing, by leaving it, on the evening after the dishonor of the note, with the bar keeper of the Tremont House, a place so well known, that very few people of any intelligence in the country can be believed to need information as to its location; and that it is in the city of Boston; and that it was directed to the defendant. These facts we consider as satisfactorily proved; and we have no reason to

doubt that the notice contained all that it was essential that a notice should contain ; that it contained information under the hand of the notary, that the note had been protested for non-payment.

We do not think it essential, that it should be stated in the notice, who was the owner of the note, or at whose request the notice was given. The late C. J. Parker, in *Shed* v. *Brett,* 1 Pick. 401, in delivering the opinion of the Court, in reference to an objection to a notice for the want of these particulars, says, that there was some show of reason in the objection ; but that the Court would require some positive authority in support of it before they would, by listening to it, sanction the mischiefs which would be likely to ensue from sustaining it. And Mr. Justice Story, in delivering the opinion of the Court, in *Mills* v. *The Bank of the U. S.* 11 Wheaton, 431, says, " it is of no consequence to the indorser who is the holder, as he is equally bound by the notice, whomsoever he may be, and it is time enough for him to ascertain the true title of the holder when he is called upon for payment." And again, in the same case, that " it is sufficient that it (the notice) states the fact of the non-payment of the note."

The law merchant, as well as the statute before cited, recognizes the notary, when a note or bill is left with him for the purpose of demanding payment, as an authorized agent to give notice of dishonor to the parties to be rendered liable thereon. *Bank of Utica* v. *Smith,* 18 Johns. 230 ; *Shed* v. *Brett,* above cited ; *Warren* v. *Gilman,* 17 Maine R. 360. When a notice is signed, therefore, by a notary public, he is to be presumed to be duly authorized by the holder, whoever he may be.

But it is contended, if the notice was left at the Tremont House, as stated by the notary, it cannot avail the plaintiff, because it is admitted, that the defendant's place of dwelling was in Bangor, and the text writers upon bills of exchange and promissory notes are quoted, as laying down the law, that if the person entitled to notice does not reside in or near the same town or city, the notice may be sent by mail to the postoffice,

addressed to him, in the place of his dwelling; and it is argued, that unless the holder or his agent can be proved to have delivered the notice into the hands of the indorser, the sending it to him by mail or by some special messenger, at his residence, will be indispensable  We think, however, that the rule is not so confined in its operation; and we coincide with the Court, in *The Bank of U. S.* v. *Corcoran*, 2 Peters, 121, that, " if notice of the non-payment of a note, though left at an improper place, was, nevertheless, in point of fact received in due time by the indorser, and so proved, or could from the evidence in the cause be properly presumed by the jury, it is sufficient in point of law to charge the indorser." It is true, however, that it is useful to have general rules, which should be allowed a controling effect in all cases coming within them; but cases will occur, which will form exceptions to them, and to which they cannot be applied  without a perversion of justice.  The rule that notice, despatched by mail to an indorser, living in a place remote from that of the indorsee, of the dishonor of a note, shall be sufficient to charge him, will not prevent the introduction of other proof, showing that due notice was given to the same effect.  The object in this, as in other cases, is to afford proof of the requisite facts that shall be reasonably satisfactory.  Circumstantial evidence is more or less relied upon in almost every case; and when it affords a reasonable conviction to the mind of the existence of a fact, it is all that the law holds to be necessary to establish it, in reference to legal proceedings.  The presumption that a notice has been received, when sent by mail to an indorser, living remote from the indorsee, is an inference from circumstances, deemed to be reasonably satisfactory.  It is an inference from the well known facts, that letters by mail seldom miscarry, and that individuals, to whom they are addressed, will, in almost every instance, sooner or later, receive them; and because it is important to the community that such an inference should be made.  But the fact of the receipt of the notice may be made out by cicumstantial evidence, even of a more cogent nature, such as to leave no reasonable doubt of its reception

in due season ; and so made out must be receivable, and be allowed to substantiate the fact. If, therefore, we can, in this case, become satisfied from the evidence legally admissible, that it is reasonable for us to come to the conclusion, that a writing was made under the hand of the notary, containing the requisite information of the dishonor of the note, and directed to the defendant, and of these facts it has been seen that we do not feel ourselves at liberty to doubt, and then, that it was placed by the notary for him, where, and under circumstances which should afford a reasonable presumption, that it must have been received in due season by the defendant, we cannot doubt, that it would be proper for us to conclude such to have been the fact.

We must now examine the evidence, and see how cogent its tendency is to prove that the defendant actually received the notice in question. The notary testifies, that he left it with the bar keeper of the Tremont House for the defendant, on the evening of the day on which demand of payment was made ; and the landlord, and one of his bar keepers testify, that great care was taken that letters so left should be duly received ; that they were at first dropped into an urn standing in the bar, and from thence taken by the persons to whom they were directed, or in the course of an hour or two sent to their respective rooms. If then the defendant was a lodger there, at that time, it can scarcely admit of a doubt that he must have received the notice. Mr. C. J. Shaw, in *Dana* v. *Kimball*, 19 Pick. 112, in reference to a letter left in a similar manner, remarked, that " the evidence that the letter left at the Tremont House, and addressed to Kimball, actually reached him, is of the same nature as a similar presumption, arising from putting a letter, so addressed, into the postoffice, and may even be considered as considerably stronger, inasmuch as there would be less probability of a failure."

That house was a place of great notoriety, and, according to the number of servants kept at it, as stated in the evidence, of great resort ; to manage and conduct which, great exactness of method must have been requisite.

We must now inquire whether the defendant, at the time when the notice was left, was an inmate of that house. In regard to this the landlord and his bar keeper cannot testify from mere recollection, and considering the multifariousness of the concerns of such an establishment, as that of the Tremont House was, they could not be expected to testify from memory as to facts, that had transpired there in the ordinary course of business, many years after they had occurred. By recurring to their books, and daily entries therein, they undertake to be positive, that the defendant was a lodger in that house from the second of May, 1837, to the twenty-sixth of the same month. The amount of their testimony on this point is, that those entries were believed to be truly made ; and the books containing them were produced in Court. The entries of the items, however, of the account with the defendant, were not made by either of those witnesses ; and they have not sworn that they saw the entries made, or that they saw them immediately after or near the time they were made ; and they both say, that they could not be sure of the time the defendant left in May, 1837, except from what appears in the books. They of course have perfect confidence in the correctness of the books ; and we may feel no doubt that they contain the truth ; but unless they were legally admissible to establish the facts to be inferred from them, they must be considered as out of the case. They do not seem to come within the rule, that memoranda, made at or about the time of an event, concerning which testimony is wanted, may be used to refresh the recollection of a witness ; for the books do not enable the witnesses to testify from recollection. Nor within the rule, that where a witness is shown a writing, which he recollects before to have seen, when the transaction stated in it was within his recollection, and he then knew it to contain the truth. The testimony of neither of the witnesses is to this effect, and is therefore merely hearsay. Greenl. Ev. § 436. Mr. Greenleaf states, as a third rule, that " where the writing in question neither is recognized by the witness, as one which he remembers to have before seen, nor awakens his memory to the re-

collection of any thing contained in it; but, nevertheless, knowing the writing to be genuine, his mind is so convinced, that he is, on that ground, enabled to swear positively to the fact," he may testify to it. If this rule be adopted according to the import of its terms, it would seem to render the positive testimony of the witnesses in this case as to the time when the defendant left the Tremont House, admissible as legal evidence, for they doubtless knew the books to be genuine. But the case, *Rex* v. *St. Martin's Leicester*, 2 Adol. & El. 210, cited in support of the proposition, is to the effect only, that a witness may have recourse to a writing, perceived by him to be in his own handwriting, to refresh his recollection. This and the other cases alluded to by Mr. Greenleaf, under this head, would seem to limit the generality of his proposition, and confine the operation of the rule to cases in which a person could recognize the genuineness of his own handwriting, without being able to recollect ever having made it, or the purpose for which it was made; and to testimony as to facts necessarily inferable from it. We may be allowed, here, to express our surprise, that, in a work of such rare merit, and so admirably succinct and lucid, as is the Treatise of Mr. Greenleaf, even an obscurity so slightly apparent, should be found to exist.

But the defect in the proof we have just been considering, seems to be obviated by the testimony of Daniel Leverett. He appears to have been a witness in the trial; and it appears also that the books of the Tremont House, which were produced at the trial, so far as the defendant was concerned, were kept by him, and in his handwriting, He, therefore, may well be allowed to refresh his recollection by a recurrence to them, and to state what appears therein to be true. He states, that he, at the time, was a bar keeper at that House, during the month of May, 1837; and on the twenty-third day of that month, the day on which the notice is proved to have been left at the bar there, he charged the defendant with a bill for washing clothes, and also for a bottle of wine furnished him while dining; that on the twenty-fifth of the same month

he charged him with board for six days; and in the account on book, there appears to be a charge on the twenty-sixth of the same month for board for one day; and the witness testifies that he settled with the defendant on that day, and received the amount due on the books, being $133,12, and balanced the books; and that the books contain a true statement thereof; so that it fully appears, by competent testimony, that the defendant was an inmate of that house for twenty-four days next previous, and up to, and inclusive of the twenty-sixth day of May, 1837. The defendant, then, must be believed to have been where, according to the testimony of the landlord and a bar keeper of the Tremont House, the notice must in all human probability have been received by the defendant as early as the twenty-fourth of that month, which was in due season; and we think the inference, that he did so receive it, is one which a jury, under like circumstances, should have drawn.

*Defendant defaulted.*