ASHLEY, EX. VS. GUNTON ET AL.

After the endorser has become fixed by demand, protest and notice, mere forbearance by the holder, not based on any obligatory contract with the drawer for day, and which does not impair any of the substantial rights or remedies of the endorser, cannot work his discharge.

No objection will be heard in this court to the admissibility of evidence on the trial, on the ground that it was secondary, or not the best that the nature of the case would admit of, unless such specific objection was taken in the court below.

It is no objection to the final order of the Probate Court, allowing a claim against the estate of a deceased person, that the claimants, endorsees of a bill of exchange, had failed to fill up a blank endorsement at some time previous to the final order of the court.

The affidavit of one of several joint claimants, is sufficient to authenticate a claim against the estate of a deceased person.

To charge the drawer or endorser of a bill, by notice of non-payment and protest left at his place of business, or residence, it should be delivered to a clerk, if there be one, at the former place, or to some proper person at the latter, if any such there be, or it should be certified .that no one could be found on application at such places. And so, it is not sufficient to charge an endorser, to show that the notary left the usual notice of non-payment at the hotel where the endorser resided, and addressed said notice to him, and left the same at said hotel — it not appearing whether the endorser was at the hotel when the notary called, whether the notary enquired for him, or handed the notice to any person to be delivered to him; or whether any person was at the hotel or not.

## *Appeal from the Circuit Court of Pulaski County.*

Hon. WILLIAM H. FEILD, Circuit Judge.

WATKINS & CURRAN, for the appellant. The facts that Ashley was the accommodation endorser or security for Sevier, which was necessarily known to the plaintiffs; that the note was suffered to remain under protest from March, 1846, contrary to all banking usage, without any suit or demand against Ashley, until December, 1848, after his death and the insolvency of Sevier; that payments of interest on the note were made by Sevier from time to time subsequent to the protest, raise a strong presumption that time was extended to Sevier.

The statute (*sec.* 88, *ch.* 4, *Digest,*) providing for the exhibition of claims against the estates of deceased persons, requires *the claimant* to make the oath that nothing has been paid or delivered towards the satisfaction of the demand, except what is mentioned or credited thereon, and that the amount is justly due. The object and policy of this statute are to afford a protection to the estates of deceased persons against unjust claims, and of which the executor or administrator may be wholly ignorant—to purge the conscience of the complainant as to the truth and justness of the demand. Here were six persons then holding this claim; it did not belong to Mr. Gunton, who alone of the claimants made the affidavit, but to the others with him. A release by, or payment to, one of several joint payees or holders, is a valid discharge

to the debtor.   Any one of these trustees might have received payment, or done any act to discharge the security; and yet another, if ignorant of it, might safely swear that the demand was unpaid and justly done.   We contend that, under the statute, where there are two or more persons constituting one claimant, to any of whom a valid payment may be made, each competent to discharge the demand in any of the modes known to the law, they must all make the affidavit required.

We contend that there is not sufficient proof of notice to charge the endorser.   If the holder undertook to give the endorser notice in Washington, it must have been a personal notice, and the evidence of the notice having been given, is not sufficient to charge him.   The only evidence is the carefully guarded statement of the notary, that he left the usual notice in writing, addressed to the endorser, at Coleman's hotel, in the City of Washington, where he resided.   Did he enquire if the endorser was in, or leave the notice at his room, or with a lodger, or inmate of the hotel, or with any servant of the house?   *Bank U. S. vs. Hatch*, 6 *Peters* 257; *Miles vs. Hall*, 12 *Sm. & Marsh.* 332; *Fortner vs. Parham*, 2 *ib.* 163; *Stewart vs. Eden*, 2 *Caines* 121; *Ogden vs. Cowley*, 2 *J. R.* 274; *Ireland vs. Ki*, 11 *J. R.* 232; *Blakely vs. Grant*, 6 *Mass.* 386; *Woolridge vs. Brigham*, 12 *ib.* 403; *Bradly vs. Davis*, 26 *Maine* 45; *Hyslop vs. Jones*, 3 *McLean* 96; *Foster vs. Senneath*, 2 *Richardson* 338; *Holland vs. Turner*,) 10 *Conn.* 308; 7 *Gill & John.* 79; *Logan Bank vs. Butler*, 3 *Littell* 349; 2 *Aikin. Verm.* 263.

The endorsement should have been filled up to show title, and the right to recover on the note.   See *Edwards vs. Scull*, 6 *Eng.* 326; *Martin vs. Warren*, *ib.* 286.

S. H. HEMPSTEAD, for the appellees.   An endorsement *in blank*, constitutes a complete and perfect transfer of the interest in a bill or note, and vests the right of action, and all other rights, in the subsequent holders.   It was not necessary to fill it up.   *Sterling vs. Bender*, 2 *Eng.* 202; *Jordan vs. Thornton*, 2 *Eng.* 230;

*Chitty on Bills*, 10 *Ed.* 229 *et seq.; 2 Hall* 563; *Story on Bills,* sec. 207; *Story on Prom. Notes,* sec. 137; 7 *Eng.* 171.

The administration law must be beneficially expounded; and scarcely any serious doubt can exist that affidavits, made by the President and Cashier of the Board of Trustees of the Bank of Washington, come within the spirit, if not the letter, of the law.

Notice of the presentment and non-payment of the bill was given to Ashley by the notary, by delivering such notice at Coleman's hotel, in the city of Washington, where Ashley then resided, addressed to him on the same day of the protest. The question is, whether the holders of this note have used reasonable diligence, so as to hold the endorser liable; for the law neither contemplates nor requires the utmost and strictest diligence, of which the case is capable. 2 *Caine's R.* 126. The course pursued in this case was regular and legal, and according to the usual practice. At all events, it amounted to reasonable diligence. 15 *Wendell* 367; 5 *Binney* 543; 1 *J. R.* 294; 6 *Peters* 297; 3 *Conn.* 497; 2 *S. & M.* 656; *Miles vs. Hall,* 12 *S. & M.* 332; 3 *ib* 250; 2 *ib* 638; 657; 9 *ib.* 476; 10 *ib.* 542.

The law of the District of Columbia, requires notice to be left at the residence, lodgings, or place of business, of an endorser. A delivery to any particular person, need not be shown. The law merely exacts from the holder that reasonable diligence be used in giving notice; but it is not his business to see that the notice is brought home to the party, and whether the notice reaches the party or not, the holder has done all that the law requires of him if he leaves notice at the house, lodging, or place of business of the endorser, where he resides with the maker in the place where the note fell due, or if he sends notice by mail, if he resides elsewhere. These principles are fully sustained by the decisions of the Supreme Court of the United States. *Williams vs. The Bank of the United States,* 2 *Peters* 96; *Bank of Columbia vs. Lawrence,* 1 *Peters* 578; *Dickens vs. Beall,* 10 *Peters* 572; *Bank of the United States vs. Hatch,* 6 *Peters* 250; *Harris vs. Robinson,*

4 *Howard* 336; *Bank of the United States vs. Carneal*, 2 *Peters* 547.

By leaving the notice at Coleman's hotel, where Col. Ashley dwelt or lodged, afforded reasonable ground to presume that it would be brought home to him, and that is all the law requires. 1 *Peters* 578; ⅖ *S. & M.* 44. But, whether the notice was received by him or not, the holder used due diligence. 3 *Kent* 107; *Stedman vs. Gooch*, 1 *Esp. R.* 4; *Ransom vs. Mack*, 2 *Hill* 590; *Bailey on Bills*, 224; 1 *Maule & Selwyn* 545; 6 *Peters* 257; *Miles vs. Hall*, 12 *S. & M.* 332; *Ireland vs. Kip*, 11 *J. R.* 231; *Hartford Bank vs. Stedman*, 3 *Conn.* 494.

Mr. Justice Scott delivered the opinion of the Court.

This proceeding originated in the Probate Court of Pulaski county. It was for the allowance and classification of a claim against the estate of Chester Ashley, deceased. The application was granted, and a bill of exceptions having been taken on the part of the executrix, setting out all the evidence and the rulings of the court, an appeal was taken by her to the Circuit Court. That court being of opinion that there was no error in the proceedings and judgment of the Probate Court, affirmed that judgment, and the executrix appealed to this court.

It appears that the claim, proceeded for by Gunton and others, as surviving Trustees of the Bank of Washington, was founded upon an accommodation note, made by A. H. Sevier, payable to Chester Ashley, or order, and by the latter endorsed in blank, and the proceeds, by virtue of his written directions attached to the note, were placed to the credit of Sevier in the Bank. The note bore date the 18th of March, 1846, was payable sixty days after date; and, on the 20th day of May next following, was protested for non-payment by a notary public. Interest having been computed upon the principal sum, and two partial payments deducted, a balance was claimed to be due on the 24th of March, 1848, of the sum of nine hundred and twenty-seven dollars and fifty-seven cents, with interest from that date. This sum was sworn

to by William Gunton, in an affidavit before a justice of the peace, in the form prescribed by our statute for authenticating claims, by individual claimants, against the estates of deceased persons: and also by James Adams, Cashier of the Trustees of the Bank of Washington, in the form prescribed by the statute, for authenticating such claims, when in favor of corporations. The official character of the justice of the peace, before whom these affidavits were made, was regularly certified.

Examined copies of the resolutions adopted at a meeting of the stockholders of the Bank of Washington, a few days before the expiration of its charter, and in contemplation of that event, and of the deeds of assignment, executed in pursuance of these resolutions, to the trustees; the survivors of whom proceed in the case before us, were proven by depositions. Washington City was, by the same means, proven to be on the Maryland side of the Potomac river, and the provisions of the law of that State, in reference to the protest of bills of exchange and promissory notes, was read in evidence from the statutes of that State, published by authority. It was also proven that Col. Ashley was serving in the Senate of the United States, at Washington City, in May, 1846, having been elected a member of that body in November, 1844, and held that post from that time until his death. He had resided in Little Rock, Arkansas, for near thirty years, and when absent from home, at Washington, his house was usually kept open by some member of his family, by whom communications addressed to him at Little Rock, during the sitting of Congress, were forwarded to him at Washington City. That, in the Capitol, at Washington City, there was, in the year 1846, a Congressional postoffice, where members of both Houses of Congress received communications addressed to them, and mailed letters and papers they desired to send out; and also a city postoffice, through which communications would reach them. That the estate of Col. Sevier was insolvent, and would not pay the privileged debts allowed against it, nor any not secured by deed in trust made in his lifetime. That, at the time the note in question was discounted,

the appellees, together with one George Bonaford, since deceased, were the surviving Trustees of the Bank of Washington, and that said appellees are the *bona fide* lawful holders of the note, on which the claim is founded. Besides the protest, read in evidence, in which nothing is stated as to notice, it was proven, by the deposition of the notary, who made it, that he made the demand and protest, and "on the same day delivered, at Coleman's hotel, in the City of Washington, where Chester Ashley, the endorser of the said note, then resided, the usual notice of nonpayment of the said note, and addressed said notice to the said Chester Ashley, and left the same at said hotel." It was also proven by a witness, who testified that he had been long conversant with mercantile and banking transactions, that it was not customary for Banks, in regular business, to let a note remain under protest, without renewal or security, for any length of time, without being put in suit; and it was otherwise shown in evidence that the partial payments endorsed on the note, under dates subsequent to the protest, were made by Sevier, and not by Ashley. That Ashley departed this life after the protest; and, about seven months afterwards, Gunton, as President of the Trustees of the Bank of Washington, advised his executrix of the note having all this time remained under protest, and enquired what arrangements would be made for its discharge, in case it was not soon paid by Col. Sevier.

After the endorser has been fixed by demand, protest and notice, mere forbearance by the holder, not based on any obligatory contract with the drawer for day, and which does not impair any of the substantial rights or remedies of the endorser, cannot work his discharge.

Whatever objection might have been urged to the admissibility of some of the evidence, on the ground that it was secondary, or not the best, for aught that appears upon the record, that the nature of the case would admit of, no such specific objection was in fact taken in the court below; and, for that reason, cannot now be heard here. And whatever might be in that objection, if the

case was different, which is based upon the failure of the appellees to fill up the blank endorsement at some time previous to the final order of the Probate Court, it can cut no figue in this case, because of the competency of that court to allow, to a *bona fide* claimant, an equitable, as well as a purely legal, claim.

According to the laws of Maryland, read in evidence, the protest was admissible: the deposition of the notary, who made the protest, is also in evidence to the same effect, and makes the question suggested, as to the admissibility of the protest, of no consequence.

We think the claim sufficiently authenticated, under the provisions of our statute, by the affidavit of one of the joint claimants. The facts of this case, as to this point, were considered by us in connection with the cases of *Beirne & Burnside vs. Imboden et al.*, 14 *Ark. Rep.* 337, and *Walker as ad. vs. Byers, id. p.* 247, when they were decided, although, in neither of these cases, this precise point was involved. Such an affidavit is within the letter of the statute, in its tenacity for the affidavit of the claimant himself at the peril of perjury; and as it has to be made in positive terms, it could not be true if payment had been in fact made to either of the co-claimants.

A more difficult question, however, is raised in reference to the alleged notice of non-payment, which it will be necessary to examine more at large.

Demand and notice are conditions precedent to the endorser's liability, and unless he dispenses with them in some way, or by some act of his own prevents them, his liability cannot arise without demand and notice. Notices, which are not personal, must necessarily be given in writing, whether through the channel of the postoffice or some other; but, in common legal parlance, all notices are, in general, deemed personal, except those transmitted through the postoffice; because they are either actually so, or regarded as tantamount to personal notice. Hence, the expression, so often found in the books, that when the parties live in the same town, the notice must be personal.

So, of personal notice, it is constantly said in the books, that notice in writing, left at the place of business, or at the residence of the endorser, is tantamount to actual personal notice. All these, however, are but comprehensive expressions, entirely true in their general scope, but the doctrines they inculcate are qualified by other doctrines, more in detail, and equally well settled, to which these general expressions do not reach.

To fix the endorser's liability, the law does not require the strictest and utmost diligence in the holder, but only that fair and reasonable effort, which the law calls due diligence. 2 *Caines Rep.* 126. Hence, in interpreting the contract between the parties for the conditional liability of the endorser, it requires that the latter shall, within usual business hours, be at his place of business, and during the usual hours of suspension of business, be at his residence, or else to have some suitable person to represent him at these respective places within these respective hours. When, therefore, the endorser performs what is thus required of him, due diligence, on the part of the holder, would carry notice home to him; and, consequently, when the parties live in the same town, and the holder uses due diligence, but, in fact, notice does not reach the endorser, the law deems it the endorser's own fault, and adjudges that he has thereby prevented the holder from performing the condition precedent to his liability.

The true question then, in cases like this before us, is, whether due diligence has been used by the holder; not whether he has given notice, or the endorser has received it. *Dickens vs. Beale,* 10 *Peters Rep.* 580. And "this consists in giving notice, if after the usual and proper enquiries are made, it is practicable to give it; but if, when this is done, the holder or notary cannot give the notice personally, when the parties reside in the same place, or does not know where to direct it by mail, the *inquiry is due diligence, without notice. Id., same page.* And the proof of diligence is upon him who asserts it. *United States vs. Baker ad.,* 4 *Wash. C. C. R.* 465. And it is not to be presumed, nor that the notary was negligent, but to be determined upon the proof.

*Rives vs. Parmley*, 18 *Ala. R.* 262. A place of business must be understood to be a place actually occupied, either continually or at regular periods, by a person, or his clerks, or those in his employment. 8 *Porter's R.*, *Stephenson vs. Primrose*, *p.* 167. And a private boarding house where the endorser lodged, must be considered, to all intents and purposes, his dwelling house. *Bnk. U. S. vs. Hatch*, 6 *Peters R.* 257.

Judge KENT says, " Where the holder and endorser reside in the same town, notice to the latter will be good, if left at his dwelling house, in a way reasonably calculated to bring the knowledge of it home : and if the house be shut up by a temporary absence, still the notice may be left there, or at his place of business." 3 *Kent Com.* 107. This latter clause is no doubt true enough; but if the call was within the proper hours respectively, and there was no proper person there to receive the notice, all the authorities on the point show that the leaving of the notice, under such circumstances, would be a work of supererogation, because the effort to give the notice, under such circumstances, would itself constitute due diligence. So, Judge STORY says, of the mode of giving notice, where the parties reside in the same place, "It may be by a verbal notice to the party personally, or it may be by a written notice left at his domicil, or place of business. If the notice be written, it is not indispensable to be given to him personally. It is sufficient if it be sent, or delivered to some suitable person at his place of business, such as his clerk or agent, or to some suitable person at his place of residence. If the call is made at reasonable hours, and no person can be found to whom the notice can be communicated, the holder, or other party giving the notice, will be excused from further efforts." *Story on Bills*, *sec.* 300, and authorities there cited.

The result is, that when the leaving of notice at the place of business or residence, in his absence, will have the effect to fix the drawer or endorser, it must be delivered to some proper person. If none such be there, within the proper hours, the leaving of the notice is unnecessary, and a work of supererogation, because

the effort to give the notice under such circumstances itself con-
stitutes due diligence. When the drawer or endorser is sought
to be charged upon the ground of such notice having been left at
his place of business or residence, it is incumbent upon the plain-
tiff to show that it was left under such circumstances as are suffi-
cient to fix his liability ; and of this, he must make clear proof.
*Bell vs. The Hagerstown Bank*, 7 *Gill's Rep.* 231. On this lat-
ter ground, the plaintiff was nonsuited in the case of *Lawson vs.
Sherwood*, 1 *Starkie* 314; where the proof was, that notice was
served on the defendant two or three days after the dishonor of
the bill, under circumstances, when notice on the second day
would have been good, but not on the third day, Lord ELLEN-
BOROUGH refusing to go upon "probable evidence without proof of
the fact," because it was upon the plaintiff "to show that notice
was given in due time."

The cases of *Rives vs. Parmly*, 18 *Ala. Rep.* 256, and *Coster
Robinson & Co. vs. Thomason, use, &c.,* 19 *Ala. Rep.* 717, dis-
tinctly recognize these doctrines, and are full to the point, "that
to charge the drawer or endorser of a bill by notice, left at his
place of business or residence, it should be delivered to a clerk,
if there be one, at the former place, or to some proper person at
the latter, if any such be there, or it should be certified that no
one could be found on application at such places." 19 *Ala. Rep.*
721. In the former case, the proof was that "notice of protest
left at the boarding house of P. R. Rives, and at the office of L.
Parmly—each this day." In the second case, it was, "Notice of
protest left at the offices of the first and second endorsers." In
both cases, for want of proof that the notices were left under such
circumstances as would charge the endorser, the holder was not
permitted to recover.

In the case before us, the proof of due diligence falls equally
short. The circumstances under which the notary left the notices
at Coleman's Hotel, are not shown further than that he delivered,
at that hotel, the usual notices of non-payment, and addressed
said notices to said Chester Ashley, and left the same at said

54BB

hotel. It does not appear whether Ashley was in the hotel when the notary called, nor whether any enquiry was made for him, nor whether the notices were handed to any person to be delivered to him; or whether any person was at the hotel or not. For aught that has been shown, the notary, when he called, might not have enquired for Ashley at all, or may have seen him, and not given the notice, but gave it to a stranger, who happened to be there *in transitu*, or even deposited it in the passage, or some private room, or otherwise left it in a manner, or under circumstances, wholly insufficient to charge an endorser, when he could have delivered it to him in person, had he enquired for him.

In the case of the *Bank of the United States vs. Hatch*, 6 *Peters Rep.* 256, where it was held that the delivery of the notice at the boarding house, to a fellow-boarder, with a request that he would deliver it to Hatch—the notary having first enquired for Hatch, and been informed that he was not within, was sufficient, Judge STORY remarked that, if the delivery had been to the master of the house, or to a servant of the house, there would have been no doubt of its sufficiency, and he cited the case of *Steadman vs. Gooch*, 1 *Esp. Rep.* 4, where the notice, left with the woman who kept the house, at which the party was a lodger, was held good, with no particular stress by the court, that decided the case, upon her character as proprietor, so as to distinguish it from a delivery to any other inmate of the house, whether servant or boarder. So, in the case of *Bradley vs. Davis*, 26 *Maine Rep.* 45, the notice was left with the bar-keeper at the Fremont House, in the city of Boston. But in the case before us, it does not appear with whom, if any one, it was left, or even that it was dropped in an urn, kept standing in the bar, as was the arrangement at the Fremont House, from whence letters were taken by persons to whom they were directed; and, if not taken within an hour or two, were sent off to their respective rooms.

Due diligence being the imperative prerequisite of the holder's right to recover of the endorser, because of the conditional contract of the latter, and the onus to prove due diligence being upon

the holder, we are compelled to say, in the light of the authorities we have cited, and others of the same caste, that we have examined, that such diligence as the law requires to charge a drawer or endorser, has not been shown in this case.

Finding this to be so, it is entirely unnecessary to examine the other question raised—which depends upon an alleged local custom of the banks in the District of Columbia—as to whether this note was not prematurely protested.

And although this case has been determined upon a dry point of law, it may not be improper to say that it is not altogether improbable that the result is consistent with its abstract right and justice on the merits, in view of the discrepancy, as to notice, between the protest in evidence and the deposition of the notary, who made it, and the unusual delay of the Trustees of the Bank, shown by the evidence, in taking steps against the endorser.

The judgment must be reversed, and the cause remanded to the Circuit Court, with instructions to reverse the judgment of the Probate Court, and enter up, and certify to that court, such judgment as ought to have been rendered in the Probate Court. *Digest, ch. 4, secs.* 181, 182.