COMMERCIAL AND AGRICULTURAL BANK v. SIMON L. JONES
AND ANOTHER.

Where an agent receives money for his principal, if he deposits it in the hands of bankers it is his duty to deposit it either in the name of the principal, or in his own name as agent of his principal, opening a new account for that purpose, if he already have one in his own name.

It is an admitted general rule, that an inferior agent is only accountable to his immediate employer, and not to the principal.

But wherever privity exists, between the principal and the sub-agent, either by an express authority to appoint a sub agent, or by authority implied by the usage of trade, or the nature of the particular employment, or otherwise, the sub-agent will incur a direct and immediate responsibility to the principal, and not merely to the agent who employed him.

Where an agent to whom a large amount of specie was consigned took it to a Bank and informed the officers of the Bank to whom it belonged, but that he had no instructions, and proposed to deposit it to wait instructions, whereupon the officers advised him to deposit it in his own name, for the sake of convenience of drawing it out, when he should receive instructions from his principal, it was held that a privity existed between the Bank and the principal; and that by passing the deposite to the private account of the agent, the Bank was guilty of a fraudulent conversion of the money of the principal, for which the latter could maintain his action.

It is not necessary to determine or inquire what would have been the rights of the principal or the liability of the Bank, if the latter had not had notice that the money belonged to the principal. If the Bank had given the agent credit on the faith of it, supposing it to be his, or not having notice that it was not his money, to the extent of such credit given, it would have had the right to retain it against the demand of the true owner.

At whatever time it was, that Dye (the agent) was permitted to draw upon the fund upon his own account, the defendants became responsible for the conversion of the deposit. If not before, there clearly was such conversion when the defendants permitted him to appropriate it to the payment of his indebtedness, and the balancing of his account with the Bank on the 5th of August.

Where an agent, to whom specie has been consigned, deposits the same in Bank to await instructions, and informs the Bank to whom it belongs, and the Bank afterwards permits the agent to apply the money to his private account with the Bank; quere, whether the doctrine of ratification applies, and whether any settlement of the principal with the agent, short of satisfaction or an express agreement to discharge the Bank, would have that effect.

But if the doctrine of ratification applies, the evidence of their (the principals) assent and acquiesence ought to be very clear and satisfactory, to hold them bound by the fraudulent appropriation of their funds, to the very parties who had practiced the fraud upon them.

Their (the principals) receiving the balance of the deposit, upon the draft of Dye (the agent) is not a circumstance which is entitled to any weight; because they were compelled by the defendants (the Bank) to submit to that as the only means of obtaining any part of what was due, without suit.

No doctrine is better settled on principle and authority than this, that the ratification of an act of an agent, previously unauthorized, must, in order to bind the principal, be made with a full knowledge of all the material facts; if the material facts be either suppressed or unknown, the ratification is invalid, because founded on mistake or fraud.

The question of ratification is, in general, a question for the Court to decide. Where the evidence is doubtful and may admit of different interpretations, there it seems proper to submit it to the decision of the jury.

Where an agent to whom specie had been consigned, deposited the same in Bank, and checked it out on his private account, and when called to account by his principal, gave his notes for the amount, and afterwards the principal sued the Bank alleging that the officers of the Bank, with full knowledge of the facts, participated in the fraudulent appropriation of the plaintiff's property, and that the plaintiff, when he took the notes of the agent, was ignorant of the facts, being deceived by the representations of the officers of the Bank, it was held that the agent was a competent witness for the plaintiff. (The agent was insolvent, the notes barred, and offered to be delivered up.)

Where, upon the whole case presented by the pleadings and the evidence offered at the trial, a different verdict would have been manifestly contrary to law and the evidence, errors of the Court in the admission or exclusion of evidence, or the giving or refusing of instructions, will not necessarily work a reversal of the judgment.

In suits for slaves, it has been held that damages, as for hire, will only be allowed from the time of a demand, (in certain cases;) but the same reasons do not apply to suits for the conversion of money, and the true measure of damages in such cases is legal interest upon the money from the time of the conversion.

Appeal from Cameron. Tried below before the Hon. Edward J. Davis.

Suit by Simon L. Jones and E. L. Ufford, late partners trading under the name and style of Jones & Ufford, against the Commercial and Agricultural Bank, Samuel M. Williams, James N. Reynolds and Theodore F. Brewer, commenced on

the 24th of March, 1852, to recover the balance of a deposit to the credit of plaintiffs made in the Branch Bank at Brownsville on or about the 18th of May, 1850. The allegations of the petition were, in substance, as follows : that about the 1st of May, 1850, the plaintiffs shipped from Monterey, in Mexico, to Brownsville, in this State, $11,000, consigning it to George Dye, to be by him deposited in the aforesaid Branch of said Commercial and Agricultural Bank, then established at Brownsville, to the credit of your petitioners and to their sole use, benefit and order ; that the money was duly received by Dye, and deposited by him, about the 18th of May, in the Branch Bank for and on account of the plaintiffs and with full notice to the officers of the Branch of the ownership of the money ; that at this period Theodore F. Brewer was a clerk in the Branch, J. N. Reynolds was the general superintendent, and S. M. Williams was the president of the mother Bank at Galveston ; that the defendants fraudulently converted the deposit to their own use by allowing Dye, after it had been made, to contract a large indebtedness to the Branch, and by their placing the deposit to his credit on the books of the Branch, and balancing his account on August 5th, 1850, so as to apply about six thousand dollars of the deposit to the payment of the debt of Dye to the Branch ; that the defendants also deceived and misled the plaintiffs by pretending that they had no knowledge of the true owner of the money and had placed it to Dye's credit at his request, and had no authority or power to prevent Dye from using it ; and the plaintiffs, under these representations, received from Dye, about August 5th, 1850, in settlement, $5,114 71 in cash and his notes for $6,000, the balance of the deposit : t .at after these notes were given the plaintiffs discovered that the representations of the defendants, whereby the plaintiffs were induced to make said settlement, were false, and made with a view to mislead and defraud the defendants. The plaintiffs prayed judgment for $5,885 29 ; interest on this sum from August 5th, 1850, and interest on

$11,000 from May 20th to August 5th, 1850, and they tender Dye's notes to be cancelled or disposed of as the Court may direct. To the original petition were annexed interrogatories to the defendants, which were answered by Williams as president of the Bank, and by Reynolds.

The answer of the Bank, made through its president, was adopted by the other defendants. Besides the general denial and a special denial of fraud, it alleged that Dye, before the transactions referred to in the petition, had a deposit account with the Branch, and was accustomed to deposit large sums of money and draw them out by checks ; that on May 19th, 1850, he brought to the Branch $11,000, which he desired to deposit to his own credit ; that the money was counted, and on May 20th, was duly entered on the books of the Branch to the credit of Dye, and that afterwards, according to mercantile law and the usage and custom of merchants, the Branch could not refuse to pay the checks of Dye on this deposite, on account of any understanding, agreement or trust existing between him and the plaintiffs ; that afterwards Dye continued to make other deposits and to check upon them, until on August 5th, 1850, he had drawn out the whole sum standing to his credit ; and that the plaintiffs never, at that time, had a deposit account in the Branch ; that Warren Jenkins, while cashier of the Branch, on May 20th, 1850, wrote to Williams, the president of the Bank at Galveston, a letter containing this passage : " $11,000 was sent down by Jones to George Dye, but no letter accompanied it and it is not drawn for ;" and upon the strength of this letter the Bank extended increased business facilities to the firm of Jones & Ufford, at Galveston, and the attention of the president was, on this account, specially directed to the monthly statements of the Branch, which in May showed a large increase in the deposit account of Dye and a large decrease in the month of June ; that from this circumstance the president suspected that Dye had deposited the money in his own name and was drawing on it, and he therefore urged Uf-

ford to go down to Brownsville and attend to it, and also requested Reynolds, who was then at Galveston and about to return to Brownsville, to use his personal influence with Dye to prevent him from drawing out any more of the funds of the plaintiffs; that Ufford did not go to Brownsville for some time afterwards, but finally went and made a settlement with Dye; that Ufford did not, on any occasion, ask the president of the Bank to direct the officers of the Branch to suspend their payments on the checks of Dye, and that the action taken by the officers of the Branch for the protection of the plaintiffs was done merely in a personal and private character and from good will to the plaintiffs, and not from any legal obligation.

The amendment to this answer, filed Nov. 7th, 1853, alleges that the plaintiffs never gave notice to the officers of the Bank that the money deposited by Dye belonged to them, nor directed that it should not be paid back to Dye on his check or order; that the plaintiffs' demand was adjusted, liquidated and satisfied, on August 5th, 1850, by the plaintiffs receiving, in full satisfaction and settlement from Dye, four notes of Dye payable to them or their order, amounting to the sum of $6,000—the plaintiffs also taking insurance on Dye's life for $5,000; that the plaintiffs afterwards continued to deal with the Branch, and it was not until they were pressed to pay a note for $1000 made by Jones and discounted by the Branch for the firm, that they set up their present demand to cover their own failure to meet the note.

A verdict and judgment were rendered against the defendants for $8,689 19; a motion for a new trial was overruled; and the defendants appealed to this Court.

The facts upon which this Court affirmed the judgment are stated in the Opinion. The balance against Dye on the books of the Branch Bank on the 19th of May, 1850, was $1912 48.

*Allen* and *Hale*, for appellants.

*H. N. & M. M. Potter*, for appellees.

WHEELER, J.   It appears indisputably that, when the plaintiffs' money was deposited in the bank, its officers were fully advised whose money it was, and to whose use the deposit was made.   It was received as the plaintiffs' money, and with the express understanding that it was to be held subject to their orders or instructions.   This is evident, as well from the testimony of the cashier, Jenkins, on whose testimony the defendants seem very much to rely, as from all the other evidence in the case bearing upon that point.   He says that Dye, when he brought the money, said he did not know from whom it came, or for what purpose it was sent; (as to this, there can be little doubt that his memory was at fault, but that is not material;) he advised Dye to deposit it to await instructions, and he did so.   Weaver, another witness for the defendants, who was present when Dye came with the money, and also when the entry of the deposit was made upon the books of the bank, testifies to the same effect, with the difference only that he understood whose money it was, and is a little more explicit; he says the money was deposited for safe keeping, until instructions were received from the plaintiffs, Jones & Ufford; that Dye said he expected daily to receive instructions from them, and send the money on to them; and that it was placed to Dye's credit and subject to his order, to enable him to draw it out when he should receive his instructions.   The information received from Blandin (under whose charge the money was sent by Everett from Rio Grande City, and by whom the bill of lading was delivered to Dye, with the remark that the money belonged to Jones & Ufford,) by Brewer, the book keeper, of which Jenkins admits he was advised, the letter from Everett to Dye, which he also admits he saw in a day or two or three after, and the answer of Williams to the ninth interrogatory, as well as the repeated statements of Jenkins, Brewer and Dye made about the same time, and which were testified to by the witnesses, place it beyond doubt or cavil, that the officers of the bank, when they received the deposit,

Commercial Bank v. Jones.

were well advised, not only whose money it was, but what its destination was ; that it was to be held and forwarded to the order of Jones & Ufford of Galveston ; and that it was entered upon the books in Dye's name, not with any intention or thought of placing it to his credit on his own private account, but only as a matter of convenience, in order that he might draw for and remit it to the plaintiffs when he received their instructions.

There is no pretence that Dye ever represented or pretended, for one moment, that it was his money, or that he had the right or a wish to have it placed to his credit on his own private account. The only ground or reason assigned by him or any one else at that time, for having it placed to his credit, was that he might be enabled to draw and remit the money to the plaintiffs when he received their instructions. It cannot be, nor is it pretended that Dye claimed or asked to have the money placed to his credit on the books of the bank on his own account ; or that the officers of the bank did not know from him and others that he had no such right, and made no such claim or pretension. The view taken of it by all parties at the time was, that it was deposited as the money of the plaintiffs, to remain to await their instructions respecting its transmission or disposition ; but as the instructions were expected to be received through Dye, the deposit was entered upon the books in his name, in order to facilitate the carrying out of the plaintiff's instructions, when received. There does not appear to have been, at the time of making the deposit, any thought of placing this money to the credit of Dye on his own account ; nor does it appear that it ever occurred to any one so to treat it, until after the return of Reynolds ; though it does appear that the other officers occasionally discussed the propriety of permitting Dye to check upon it, whether before or after that time does not very clearly appear.

We need not discuss the evidence upon this point, as it is not necessary in the view we take of the case. It is enough

that the officers of the bank knew, when they received the deposit, whose money it was, and on whose account it was sent, and what was its destination ; and that the entry of it upon the books, was made in the name of Dye for the purpose of enabling him to carry out the instructions of the plaintiffs when received ; and not with the understanding or intention of placing it to his credit on his own private account with the Bank. This is the most favorable view of the defendants' case which can be taken of it from their own evidence. None of their witnesses (except, perhaps Jenkins, who evidently was mistaken, as we may notice hereafter,) state or pretend anything to the contrary of this ; but only that having placed the deposit to the credit of Dye : that is, having made the entry of it in his name upon the books of the Bank, its officers had no authority to prevent Dye from appropriating the money to himself, on his own private account, and thus using it to pay off his indebtedness, and balance his account with the Bank. This was the view taken by the officers, and on which they acted. It is the only ground on which they can shelter themselves and the Bank from responsibility to the plaintiffs. And on its correctness their defence must rest.

The defence involves a question of the right of Dye to make the deposit to his own credit, and the propriety of the conduct of the Bank by its officers, in so advising him ; and the further principal question of the right of the defendants to pass the deposit to the credit of Dye's private account with themselves.

As to the first branch of this inquiry : Judge Story says, in regard to agents receiving money for their principals, it is a clear duty, if they deposit the money in the hands of bankers, to deposit it in the name of their principals, and not in their own names. (Story on Agency, Sec. 208, 202, 218.) The same doctrine is contained in Paley on Agency, and in the cases cited in the notes. Chancellor Walworth says, " executors " and trustees must be made to understand that it is their " duty to keep the funds of their trust separate and distinct

" from their own funds and business." Abbott, C. J. is said to have disposed of this subject in a satisfactory manner when he said " there are three modes which a person may adopt, " when the money of others is placed in his hands. The first " is for him to keep it in his own house ; what the consequences " of that mode are, it is at present unnecessary for me to state. " Another mode is for the party to pay it into his bankers on " his general account ; but the third, and the correct mode is, " for the party to open a new account in his own name for this " particular purpose." (Paley on Agency, 47 n. 10 n. by Lloyd, 3 Am. edit ; 1 Paige, 402 ; 5 Car. & Payne, 59.) It seems, therefore, that Dye had not the right to deposit the money to his own credit ; and by so doing he rendered himself responsible to the plaintiffs in case of a loss. And, under the circumstances, and with a knowledge of the facts, the cashier of the Bank gave him very improper advice, and such as would render the Bank responsible for receiving and passing the money to the credit of his private account, if that was, in fact, intended. But it is evident it was not so intended at the time.

It is an admitted general rule, that an inferior agent is only accountable to his immediate employer, and not to the principal. (Paley on Agency, 49 ; Story on Agency, 217 a, 386.) And it is upon this principle, that, where the agent employs a sub-agent, without the knowledge or consent of his principal, express or implied, there exists no privity between the principal and the sub-agent. But wherever such a privity does exist, either by an express authority to appoint a sub-agent, or the authority is implied by the usage of trade, or the nature of the particular employment, or otherwise, the sub-agent will incur a direct and immediate responsibility to the principal, and not merely to the agent who employed him ; since a privity will, under such circumstances, exist between them. " Wherever," (says Judge Story,) " such a privity does exist, " the sub-agent will incur a direct and immediate responsibility

" to the principal, and not merely to the agent who employs " him. (Id. Sec. 388, 217 a, 387, 201.)

In Wilson v. Smith, (3 How. 763,) Chief Justice Taney said, " We think the rule very clearly established, that whenever, by " express agreement between the parties, a sub-agent is to be " employed by the agent, to receive money for the principal, or " where an authority to do so may fairly be implied from the " usual course of trade, or the nature of the transaction, the " principal may treat the sub-agent as his agent, and when he " has received the money, may recover it in an action for money " had and received."

It cannot be doubted that Dye had authority to deposit this money in Bank on account of the plaintiffs ; if not conferrd in expresst erms, at least impliedly from the nature of the transaction. It was intended by the plaintiffs that it should be so deposited. That was the purpose for which it was consigned to Dye. He was but the instrument of the plaintiffs used by them for the purpose of employing in their behalf, the agency of the Bank. There was therefore a privity between the Bank and the plaintiffs, and the Bank became directly and immediately responsible to the plaintiffs, and not merely to the agent employed by the plaintiffs in making the deposit. Being so responsible, there can be no clearer proposition than that they had no right to pass the deposit to the private account of Dye. Whenever they did so, they were guilty of a fraudulent conversion of the money of the plaintiffs ; because they knew the money was not Dye's, but the plaintiffs' and that he had no authority or right to have it passed to his private account.

It is not necessary to determine or inquire what would have been the rights of the plaintiffs, or the liability of the Bank, if they had not had notice that the money did not belong to Dye. If they had given him credit on the faith of it, supposing it to be his, or not having notice that it was not his money, to the extent of such credit given, they would have had the right to retain it against the demand of the true owner. But

the case of Wilson v. Smith, (3 Howard, 763) is a clear authority to show that even then they could not have retained any part of the money on account of Dye's previous indebtedness, or of any indebtedness of his not created on the faith of the deposit. In that case, a draft had been placed by the plaintiffs in the hands of their agent for collection. The agent sent it to the defendant for acceptance and collection. The agent was indebted to the defendant at the time. The draft was accepted and paid to the defendant, who credited the proceeds to the agent. The draft was payable to the order of the plaintiffs, and indorsed in blank ; and the defendant, when the draft was sent to him was not apprised to whom it belonged, nor were any instructions or directions given to him respecting the disposition of the money. Nevertheless the Court held, as the defendant had given no new credit to the agent on account of the remittance of the bill, he could not protect himself against the plaintiffs' action to recover of him the money, by passing the amount of the bill to the general credit of the agent, although the agent was his debtor. It was said in the Opinion of the Court, that the agent transmitting the paper to the defendant, appeared by the indorsement upon it to be the real owner, and the defendant had no notice to the contrary. Still as the agent lived at Augusta, and the bill was to be collected at Savannah, it could not have been expected by the plaintiff that the agent was to go there in person to make the collection, nor could the agent have so understood it ; and according to the usual course of dealing among merchants, the transmission of the paper to the agent at Augusta, gave him an implied authority to send it for collection to a sub-agent at Savannah ; there was, therefore, a privity between the plaintiffs and the sub-agent, the defendant ; and the principal in that case might treat the sub-agent as his agent, and hold him responsible to him accordingly in an action to recover the money. (Id. 761, 762.)

The present is a much stronger case for the plaintiffs. For

here the defendants were apprised of the nature of the trust and the extent of the authority confided to Dye. They knew that the money was not his, and that he had no right or authority to have it placed to the credit of his private account ; or to draw for and use it in the payment of his own indebtedness, or for any other purpose on his own account. If he proposed to draw upon the deposit for any such purpose, they could but know that he was exceeding his authority and was practising a manifest fraud upon his principal. By permitting him to do so, they became participants with the fraudulent agent in the conversion of the money of his principle, and are equally liable with him for the money so converted to his use.

The case of Frazier v. The Erie Bank, (8 Watts & Serg. 18,) was not so strong a case for the plaintiffs as this ; for in that case the Bank had no notice of the ownership of the draft when they gave the credit. But because they had notice before they paid the money on the check of the agent, they were held liable in an action by the owner, notwithstanding the payment. If an agent, it was held, procure the note of his principal to be discounted, and deposit the proceeds in bank to his own credit, the principal may maintain an action therefor against the bank in his own name, notwithstanding the bank, after notice, had paid the money on the check of the agent. The Court said : " It is a suit by the owner to recover money " in the hands of a third person, who holds it, after notice, for " his use. A merchant sends his clerk to deposit money " in bank, and instead of depositing it in the name of his em- " ployer, he deposits it in his own name ; would a payment to " the clerk, after having notice of the fraud, protect the bank " from the suit of the principal ? Would it be necessary to bring " suit in the name of the clerk ? This will not be pretended ; " for to whom does the money belong ? Surely not to the " clerk, but to the principal ; and as soon as the bank are in- " formed of the fraud, they become stake-holders and must pay " the money to the person entitled to it. Again, a merchant

" sends his clerk with a check to draw money out of bank for
" the ordinary purposes of his business.    The clerk draws the
" money and deposits it in his own name.    Of this the bank in
" due time have notice.    To whom are they bound to pay the
" money ?    To the fraudulent clerk or the owner ?    Can it be
" that by the fraudulent transfer of the funds to himself, he ac-
" quires such a property as that he only can receive it, and that
" it can only be received in his name ?    It is true, that until the
" bank has notice, they may consider the agent as the owner of
" the funds ; but when they are informed the money belor gs to
" the principal, they are, as in justice they should be, placed in
" a different situation.    They are stakeholders for the owner,
" and must, at their peril. pay it to him ; and to protect them-
" selves they my require an indemnity." (Id. 20, 21 ; Paley on
Agency, 338, n.)

It is clear beyond question, that Dye had no right or autho-
rity to deposit the money in his own name and on his own
account : and that the officers of the Bank, knowing his want
of authority, had no right to receive and pass it to his credit
on his own account, or to permit him to draw upon and use it
in a manner totally inconsistent with the nature of his trust
and authority, and the known purpose and object for which it
had been consigned to him.    It is immaterial whether the
deposit was entered in the name of Dye, with the view of
placing it to his credit on his own account in the first place,
or the so treating it was an afterthought.    In either case there
was a wrongful conversion of the plaintiffs' money.    I think
the evidence very clearly shows that it was not so intended at
the time of making the deposit.    If it was, it was a manifest
fraud upon the plaintiffs, both on the part of Dye, and the
officers of the Bank.    If, on the other hand, it was afterwards
passed to the credit of Dye, or treated as if placed to his
credit on his own account, because, the entry having been
made in his name and to his credit upon the books of the Bank,
the officers supposed they had no control over it, and no right

to prevent him from drawing upon it on his own account and in known violation of his trust and authority, they were in error, and however honestly they may have entertained that opinion, it operated no less a fraud upon the plaintiffs. It is the misfortune of the defendants that their agents should have so mistaken their duty ; but it is but right and proper that they, rather than the plaintiffs, who were in no fault, should suffer the consequences of the mistake.

At whatever time it was, that Dye was permitted to draw upon the fund upon his own account, the defendants became responsible for the conversion of the deposit. If not before, there clearly was such conversion when the defendants permitted him to appropriate it to the payment of his indebtedness, and the balancing of his account with the Bank on the 5th of August. By that appropriation of the deposit, they rendered themselves liable to the plaintiffs for a tortious conversion of it to their own use. And the plaintiffs are clearly entitled to maintain their action upon the uncontroverted facts of the case, as given by the defendants' own evidence, and that of witnesses whose testimony they do not question.

The settlement of the 5th of August is relied on as a ratification by the plaintiffs of the acts of Dye, and a consequent discharge of the liability of the defendants. There is no doubt that where the principal, upon a full knowledge of all the circumstances of the case, deliberately ratifies the acts of his agent he will be bound thereby, equally as if he had originally given him a direct authority, to the extent to which the acts reach. But what will be deemed to amount to such ratification must depend upon the circumstances of the case, and the nature of the act to which it relates. Here the Bank was the agent of the plaintiffs and primarily liable to them, equally with Dye, for the conversion of the deposit. They might accept satisfaction from one of the parties thus primarily liable to them, and it would operate as a satisfaction to both. But it is questionable whether, in such a case, what would ordinarily

amount to a ratification, as between the principal and agent and third persons, would have the same effect as between the plaintiffs and the defendants, as respects the liability of the latter for their tortious acts directly affecting the former : whether, indeed, the doctrine of the ratification by a principal of the acts of his agents, in strictness, applies to such a case. A ratification can stand upon no higher ground than an original authority ; and it is scarcely a supposable case, that any one would confer an authority to practice a fraud upon himself. " A ratification," it is said, " can only be effectual, be- " tween the parties, when the act is done, by the agent, avow- " edly for and on account of the principal, and not when it is " done for, or on account of the agent himself, or of some third " person. This would seem to be an obvious deduction from " the very nature of a ratification, which pre-supposes the act " to be done for another, but without competent authority from " him ; and therefore gives the same effect to the act, as if it " had been done by the authority of the party for whom it " purported to have been done and as his own act." (Story Agency, Sec. 251.) The act of which the plaintiffs complain, did not purport to be done for them, or on their account. It was done for their agents, in violation of the known rights of the plaintiffs ; and it is very questionable whether the doctrine of ratification, which is invoked, is applicable to the case ; whether anything, indeed, can have the effect to discharge the defendants of their liability, short of what would amount to a satisfaction or discharge of the plaintiffs' demand upon them ; as payment, accord and satisfaction, or a release. If not, the taking of the promissory notes of an insolvent, cannot have that effect, unless it were expressly agreed that they were to be received in full satisfaction, or the evidence be so clear and satisfactory as to leave no doubt that such was the intention of the parties. (Peter v. Beverly, 10 Peters, 568.)

But if the doctrine of ratification applies, the evidence of their assent and acquiescence ought to be very clear and satisfac-

tory, to hold them bound by the fraudulent appropriation of their funds, to the very parties who had practiced the fraud upon them. Their receiving the balance of the deposit, upon the draft of Dye is not a circumstance which is entitled to any weight ; because they were compelled by the defendants to submit to that as the only means of obtaining any part of what was their due, without suit. The defendants persisted in re-cognizing no other authority to draw upon the deposit than that of Dye ; and to obtain anything the plaintiffs were compelled to submit. Nor do we think the taking of Dye's notes and the attempt to obtain satisfaction from him sufficient evidence of a ratification of his acts to release the Bank, under the circumstances. The plaintiffs were led to believe that they might ultimately obtain satisfaction from Dye. They believed that the Bank, and especially Reynolds, in whom they appear, at that time, to have placed implicit confidence, had done them no intentional wrong, but on the contrary had befriended them. They were evidently much influenced by Reynolds, in all they did in the matter of the settlement. However they may have blamed Jenkins for not interposing in their behalf, and be-friending them, as they supposed Reynolds had done, they appear to have been convinced that the Bank had done nothing to incur a legal liability to them. It is evident they were deceived and mislead as to the true state of the case. It is said Dye's testimony shows that he apprised them of all the facts. If he did, there is reason to apprehend the officers of the Bank did not ; and that they trusted to the representations of the latter, rather than to those of the former. There is reason to believe they were persuaded the officers of the Bank, especially the cashier, did not know whose money it was when he received the deposit and directed it to be placed to Dye's credit. He constantly represented and has testified that Dye stated he did not know whose it was. He accounted in that way for having placed it to Dye's credit. The testimony of Blandin and his own deposition shows that he, the cashier, and

the book-keeper did know whose it was ; and if Dye stated he did not know, the officers of the Bank must have known he was stating an untruth at the time ; and it makes their conduct the more culpable in placing the money to his credit, and even advising him to have it so entered ; and then aiding him in appropriating it to the payment of his indebtedness to the Bank. But the cashier is doubtless mistaken in his recollection as to Dye's statement ; as he might very easily confound his statement that he had no instructions, with what he supposes him to have said. Yet he has constantly persisted in declaring that such was Dye's statement. He, doubtless, so represented to the plaintiffs, at and before the settlement, and thus induced them to believe the entry of the deposit to Dye's credit was unavoidable; as, indeed, in his deposition, he says that it was. The effect of this representation was the suppression of a very material fact. The defendants, in their answers, and in their statements to the witnesses, have at all times insisted that the deposit was so made by Dye that he alone had the right to draw upon it; and that they had no authority or power to prevent him. It is but fair to conclude that, at and before the settlement, they so represented to the plaintiffs, and that the latter believed their representations, rather than those of Dye, if, in fact, he did state to them the facts as they transpired. The plaintiffs had a right to rely upon the representations of the defendants ; and having made the settlement under the influence of those representations, it cannot be held binding upon them as a ratification of the acts of Dye. "No doc-"trine is better settled on principle and authority than this, "that the ratification of an act of an agent, previously unauth-"orized, must, in order to bind the principal, be with a full "knowledge of all the material facts—if the material facts be "either suppressed or unknown, the ratification is invalid, be-"cause founded on mistake or fraud." (Per Story J. in Owings v. Hull, 9 Peters, 629.) It is immaterial that the defendants believed their representations to be true. The effect was

the same upon the plaintiffs as if they had been intentionally false.

The question of ratification is, in general, a question for the Court to decide. Where the evidence is doubtful and may admit of different interpretations, there it seems proper to submit it to the decision of the jury. (Story on Agency, Sec. 253.) We think it sufficiently clear that there was not a binding ratification of the acts of the agent in this case, to have justified the Court in declining to submit the question to the jury. But if not, the question was fairly submitted to them, under a charge substantially correct ; and their verdict was well warranted by the evidence. The Judge did not tell the jury, as the argument assumes, that it was necessary to a ratification of the agent's acts, that the plaintiffs should actually discharge or absolve the Bank. That was not the proposition which the charge enunciated. If the charge did not sufficiently define what would amount to a ratification, the defendants should have asked proper instructions on that subject; which they did not. The charges asked were objectionable because they did not express the essential principle, that to render a ratification binding it must have been deliberately made under a full knowledge of all the material facts.

We deem it unnecessary to enter upon a particular examination of the several propositions embraced in the charge of the Court, and in instructions asked by the defendants. Considered in reference to the facts, the charge was substantially correct ; and there was no error in refusing the instructions asked.

The objection to the competency of the witness Dye, we do not think well founded. Apart from his insolvency, the notes given by him to the plaintiffs were barred by the Statute of Limitations, and so was any remedy they might have against him. There was no subsisting legal liability on his part to the plaintiffs. Besides the notes were offered to be delivered over to the defendants. If they had seen proper to ask it, they

might have had them assigned and transferred to themselves. But they would have been equally worthless to them as to the plaintiffs. If the witness had any interest, it was adverse to the plaintiffs ; for upon a recovery by them he would be liable to the defendants, and that would be a present, subsisting liability. If his testimony had been excluded, the result could not have been different. For if, upon the other evidence in the case, the jury had returned a verdict for the defendants, it would have been manifestly contrary to law and the evidence, and must have been set aside. Where that is the case, the erors of the Court in the admission or exclusion of evidence, or the giving or refusing of instructions, will not necessarily work a reversal of the judgment.

It is objected that the Court erred in directing the jury to find interest from the date of the settlement ; for that interest could only be given from the date of the demand, at most. A demand and refusal is evidence of a conversion ; but it is not the only evidence. Here there undoubtedly was a conversion when the plaintiffs' funds were passed to the credit of Dye in balancing his account with the Bank on the 5th of August ; and it was from that date the jury allowed interest. In suits for slaves it has been held that damages, as for hire, will only be allowed from the time of a demand. But the same reasons do not apply to a suit for the conversion of money. In cases like the present, the true measure of damages appears to be interest upon the money from the time of conversion. (Sedgwick, Meas. Dam. 491.) The evidence shows very satisfactorily, that that was on the 5th of August, if not before ; and that any demand which might have been made at that time, or subsequently, would have been unavailing. None was necessary to render the conversion complete. Whether the giving of interest in such cases, is a rule of law, or a matter left in the discretion of the jury, it is said, does not clearly appear. Mr. Sedgwick holds the former opinion. (Sedg. Meas. Dam. 491.) In suits for the

conversion of property, with us, the question of damages is for the decision of the jury. (Pridgen v. Strickland, 8 Tex. R. 427.) But in a suit for the conversion of money, if damages are allowed at all, it must be in the form of interest. On principle the plaintiff is entitled to his damages as well for the tortious conversion of money as property ; and as legal interest is the only rule by which to measure the damages, it is not perceived that there can be error in instructing the jury to allow interest.

In considering the case we have left out of view the testimony of the witness Dye, and any evidence there may have been tending to cast doubt upon the fact of the deposit having been entered in the books to his credit in the first instance. And upon the facts of the case uncontroverted by the defendants, we think the judgment clearly right upon the merits ; and are of opinion that there is no error in the rulings of the Court assigned as error. The judgment is therefore affirmed.

Judgment affirmed.