## ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

## MARCH TERM, 1911.

---

*(Continued from Volume 154)*

---

J. W. WINKLEBLACK, Appellant, v. THE NATIONAL EXCHANGE BANK, Respondent.

Springfield Court of Appeals, April 3, 1911.

1. **PRINCIPAL AND AGENT: Representations of Sub-Agent: Liability of Principal: Real Estate Brokers.** Defendant's agent for the sale of a farm became associated with a real estate broker in a deal whereby the plaintiff, a client of the latter broker, was to exchange his property for defendant's farm. Defendant's agent had the other broker take plaintiff to show him defendant's farm and while viewing the farm the broker represented that a certain house was on the land. After the deal was made it developed that the house was not on the farm and plaintiff sued to have the trade rescinded. *Held*, that defendant was not bound by the representations of the broker, who at best was a mere sub-agent employed without knowledge or authority from defendant and that defendant could not be held to have ratified the sub-agent's act by retaining the benefits from the trade, after acquiring knowledge of the misrepresentations, where it appears that at the time such knowledge was obtained defendant could not be placed in statu quo.

2. ———: **Employment of Sub-Agent: Liability of Agent.** By an unauthorized delegation of his authority or by the employment of a sub-agent on his own account, the agent makes himself personally responsible for the acts of the sub-agent, who

is regarded as his agent and not as the agent of the principal. There exists no privity of contract between the principal and sub-agent and the principal is in no way liable for the sub-agent's acts.

3. ———: ———. Because of the trust and confidence reposed in an agent and the discretion and judgment which an agent is required to exercise, one clothed with authority to act for a principal must ordinarily perform the act himself.

4. FRAUD: Misrepresentation: Rescinding Trade: Placing Parties in Statu Quo: Principal and Agent: Acts of Sub-Agent. In a suit to rescind a real estate trade on the grounds of misrepresentations, it appeared that the agent of defendant had associated with him in the deal, a real estate broker and that this latter broker showed plaintiff defendant's farm and made the misrepresentations of which plaintiff complains. The defendant was *held* not responsible for this broker's representations for the reason that the broker was a mere sub-agent of defendant's agent and had been employed without defendant's knowledge or authority. It further appears that at the time defendant was notified of the misrepresentations the property that plaintiff had traded had passed into the hands of the broker, who had showed plaintiff the land and that one of the notes executed by plaintiff, which was secured by deed of trust on the farm, had been transferred; that therefore, defendant could not be placed in statu quo and neither could the plaintiff, without loss to defendant. *Held*, that the trial court was justified in refusing to rescind the trade.

Appeal from Greene Circuit Court.—*Hon. James T. Neville,* Judge.

AFFIRMED.

*N. B. Wilkinson* for appellant.

(1.) If respondent did not know that the dwelling house was not upon the land when its agents showed it to appellant, then the mistake was mutual, and equity will adjust the wrong done appellant. Weissenfels v. Cable, 208 Mo. 515; Curry v. Griffith, 115 Mo. App. 369; Griffith v. Townley, 69 Mo. 19; Chrisman v. Linderman, 202 Mo. 613; Miller v. Fire Brick Co., 139 Mo. App. 25. (2) Where the acts of a party operates as a fraud, even though done without a fraudulent in-

tent, a party cannot be permitted to reap any benefit from it. Clarkson v. Creely, 40 Mo. 114. (3) A mistake in the representation of facts about land will be corrected in equity no matter how innocently made. Glasscock v. Minor, 11 Mo. 657. (4) The general rule of law is that the assertion to the injury of another of something not known to be true, is equally as reprehensible as the assertion of that which is known to be false. Dunn v. White, Adm., 63 Mo. 181; Hamlin v. Shell, 120 Mo. 181; McBeth v. Craddock, 28 Mo. App. 380; Pomeroy v. Benton, 57 Mo. 531; Walsh v. Moore, 80 Mo. 568; Caldwell v. Henry, 76 Mo. 254; Judd v. Walker, 215 Mo. 324. (5) It is not necessary for plaintiff to show that the misstatements were wilful or intentional on the part of respondent. McLennon v. Siebel, 135 Mo. App. 264; Green v. Worman, 83 Mo. App. 568; Hitchcock v. Baughan, 36 Mo. App. 216; Smithers v. Brisher, 2 Mo. App. 419.

*Mann, Johnson & Todd* for respondent.

(1) The allegations of fraudulent representations contained in plaintiff's petition are not supported by the testimony. The allegation in the petition is that the representation was false and faudulently made, and that such representations were known by the defendant to be false and fraudulent. Koontz v. Kaufman, 31 Mo. App. 397; Snyder v. Stemmons, 131 S. W. 724. (2) Alyea, if not acting for himself in showing plaintiff the land was at most acting as the agent of Cowden, and an agent of an agent is not the agent of the principal. Unless the principal empowers the agent to delegate the agency, it cannot be done, and any representations Alyea might have made to plaintiff did not, and could not, bind the defendant in the absence of proof that either he was authorized by defendant to represent it in the transaction or that Cowden was empowered to delegate the agency. Land & Lumber Co. v. Christman, 204 Mo. 371. (3) The plaintiff in a former suit between the

same parties, affecting the same subject matter, alleged that the representations made to him were innocently made on the part of the defendant and not made for the purpose of cheating or defrauding him, and for that reason plaintiff was estopped from taking the position on which he now seeks to recover. Houghawout v. Royse, 122 Mo. App. 72; Bensick v. Cook, 110 Mo. 182; Kirkpatrick v. Railway, 211 Mo. 68.

NIXON, P. J.—This was an action in equity to rescind the purchase and exchange of real property between appellant and respondent. The defendant obtained judgment from which the plaintiff appeals.

The facts in this case are substantially as follows:

Plaintiff, who was a resident of Atchison, Kansas, was the owner of a house and lot in Kansas City, Kansas, on which there was a deed of trust for $100. Defendant, a banking corporation of Springfield, Missouri, was the owner of a tract of land in Howell county, Missouri, which it had bid in at a foreclosure sale under deed of trust securing a note held by it. Sometime prior to the trade, defendant had told the witness, A. S. Cowden, who was trustee in the deed of trust above mentioned, that all it, the bank, wanted out of the land was the amount of the note for which the deed of trust was foreclosed, with the interest, and authorized him to sell the land and get the defendant back its money and make what he could by way of commission in addition to the amount going to the bank. A short time after this, Cowden spoke to the witness, W. S. Alyea, a real estate agent who lived in Kansas and an acquaintance of Cowden, and asked him if he could find a buyer for the Howell county farm. Alyea then went to plaintiff and struck up a trade with him, plaintiff to trade his equity in his house and lot in Kansas City, Kansas, for the Howell county land, and pay the difference by notes secured by deed of trust on the Howell county land. As a result of this negotiation, Alyea and plaintiff went to Howell

county to look at the land. On their way back to Kansas City, they stopped in Springfield and went to Cowden's office. Cowden interviewed the officers of the bank in regard to the trade and they agreed to take $400 worth of the notes so secured, provided the sum of $115 was paid in cash to the bank, which said notes and cash payment would make the bank whole on its original indebtedness, or the amount it was out on the farm. It was then agreed between Cowden, Alyea and plaintiff, that plaintiff would go home, send the abstract to his property to Springfield, and that the necessary papers conveying the property would be executed and exchanged, Alyea agreeing to take one note for $100 secured by said deed of trust, and to pay the bank the $115 in cash which the bank demanded in addition to the $400 in notes so secured. When the trade was finally consummated, after some delays, this deed to the Kansas City property was filled out to Alyea, and the uncontradicted testimony is that this house and lot, subject to the deed of trust then on it, went to either Alyea or Alyea and Cowden as their profit in the deal, and that the only consideration the defendant got out of the trade was the $400 in notes and the $115 in cash paid by Alyea.

There is no substantial evidence in the record showing that the defendant or its agent, Cowden, made any representations whatever to the plaintiff or anyone representing him that there was a house on the land, and the evidence tended to show that the officers of the bank knew nothing about the farm as to whether there was a house on it or not. In the petition the plaintiff alleges that Alyea showed him the land as the agent of the defendant, but there is no testimony in the record showing that Alyea had any connection with the defendant as its agent. There is no evidence that the defendant bank ever authorized Cowden to employ a sub-agent, nor is there any evidence to show that any officer of defendant bank had any knowledge of the agency of Alyea or

that he had any connection in any way with the deal prior to its consummation. Cowden testified that Alyea was not the agent of the bank, and Alyea testified that he represented the bank "through their agent A. S. Cowden." Cowden further testified that he represented the bank in the deal, and there is no evidence that he made any representations whatever to the plaintiff as to the house being on the land. After the exchange of lands was completed, plaintiff moved to Howell county and occupied the house. On making a survey of the land which he had purchased, he ascertained that the house was not on the land but that several years prior to his purchase it had been moved some 250 yards off the farm he purchased onto another's land.

The following evidence was given on the trial of the case: The plaintiff gave the following account of his acquaintance with Alyea: "Well, along about the first of November, 1908, I saw Mr. Alyea in Kansas City. I lived then in Kansas City, Kansas, just across the line. The property I traded for this land was in Kansas City, Kansas. I usually worked in Kansas City, Missouri. I met Mr. Alyea in Kansas City, and he being a friend of a nephew of mine, I asked him to come to my house, and while he was there, I said, 'You haven't got some good farm land that you can trade me for this house and lot, have you?' He said, 'No, I haven't; if I can find anything I will let you know. I am agent for land all over the country, and I can probably find something.' It went on about a week or so after that, and I got a card from him. Q. Well, you got information from him? A. I had information that he had eighty acres of land that belonged to some one else that he was agent for in Howell county, Missouri, and asked me if I wanted to trade for it. He described the land as eighty acres, with, I believe, five hundreds apple trees, and so many peach trees, and a spring, and a house and other outbuildings. It was this land that I finally traded for."

Cowden, the agent of the bank, testified as follows

as to the circumstances of his acquaintance with Alyea:
"Well, I don't know when I first met Alyea in connec-
tion with this matter; my recollection is that the
foreclosure sale was on the 8th of August, 1908, and it
was some time not very long after that, perhaps Septem-
ber, 1908. Now when this trustee's sale was closed up
and the deed delivered to the Exchange Bank, Mr. E.
N. Ferguson who was then vice-president of the bank
asked me to sell the land for them, and stated that all
they wanted was their money out of it that they had in-
vested, and if I could get more than that I was welcome
to all I could get over and above that. I made an effort
to sell it instantly and Mr. Alyea was in the office later
on; he was in there quite often when he came to Spring-
field and I told him about this property and about what
amount it would take to purchase it. Q. Did he bring
any one to you to purchase it after that? A. Now
about November, my recollection is that it was the day
before Thanksgiving, he came to me with Mr. Winkle-
black. Q. And following that the land was deeded to
Mr. Winkleblack? A. Yes, sir. Q. Whom did Mr.
Alyea represent in this transaction? A. As far I know
he represented himself. Q. Did he represent the
National Exchange Bank? A. No, sir, he did not. Q.
Did they pay him a commission? A. No, sir. Q.
Was there any agreement that they should pay him any
commission? A. None whatever. Q. This trade as I
understand it was made by Winkleblack deeding some
property he had in Kansas City, Kansas, and giving a
deed of trust back on the farm for a certain amount?
A. Yes, sir. Q. Now that land in Kansas City, Kansas,
to whom did that go? A. The deed was made, the way
I recollect it, in blank, but the property was to go to Mr.
Alyea. Q. Did it go to the bank? A. No, sir. Q. Do
you know that it did go to Alyea? A. I know the deed
was sent to me and I forwarded the deed and abstract
to Alyea at Atchison, Kansas. Q. The bank had no
interest in the Kansas City, Kansas, property at all? A.

None whatever. Q. What did they get out of this? A. They got four hundred dollars of these notes secured by a deed of trust. There were five notes of $100 each, and the bank got the first four notes and $115 in cash. Q. Who paid the $115 in cash? A. Alyea sent me a draft for it from Atchison, Kansas. Q. That was turned over to the bank? A. Yes, sir. Q. They got no interest in the Kansas City, Kansas, property at all? A. None whatever. Q. You forwarded that deed executed by Winkleblack to Alyea? A. I forwarded the deed executed by Winkleblack to the property in Kansas City, Kansas, and the abstract to that property which was sent to me to Alyea at Atchinson, Kansas, and by return mail he sent be a draft for $115. Q. That I believe you say was executed in blank? A. That is my recollection of it, that it was executed in blank. Q. You know that the bank never had any interest in that land at all? A. None whatever. I know that they refused to have anything to do with the land." Cross-examination: "Q. Who gave Alyea a description of this property in Howell county? A. Mr. Fisher, the former owner of the property. Q. How did he come to do it? A. I think it was at my request. Q. You were acting for the bank? A. Yes, sir. Q. So far as you know all the information that Alyea had concerning that was obtained through you and Mr. Fisher at your request? A. So far as I know the description of the property and everything of that nature was obtained from Mr. Fisher. Q. But you sent Alyea to Fisher, and you were acting for the bank? A. No, sir; I didn't send him to him; I think I called Fisher up and asked him to come to my office. Q. You called Fisher up, and said, here is a man that can tell you about this land? A. Yes, sir. Q. And Alyea was told all about it there in your office? A. I couldn't tell you about that. Q. Now I will ask you if you didn't understand all the time after this fact was discovered,—until after this trade was made,—that this house was upon the land in question;

wasn't that your understanding and the bank's under-standing, that this house was upon the land there? A. I don't know anything about the bank at all. Q. You had conversations with Mr. Meyer, the president of the bank, didn't you? A. I never had any conversation with Mr. Meyer until this transaction was closed, or on the day on which they executed the deed. That was the first conversation I ever had with Mr. Meyer in regard to it. Q. This house had been on the land, had it not, you have learned since? A. Well, I have heard so; I don't know personally. By Mr. Johnson: Did you ever represent to Mr. Alyea or any one else that the house was on the land? A. No, sir. Q. Did they have any conversation with any of the officers of the bank in regard to this, or were all the dealings had with you? A. He dealt with me entirely. I don't think he saw any of the officers of the bank until after this deal had been closed up. If he did, I never knew anything about it."

As we have stated, soon after plaintiff and Alyea opened negotiations for the exchange of the land, Alyea and plaintiff went to Howell county and examined the land. Plaintiff gave the following account of what occurred: "We got off at Sterling—is just a switch and flag station—and walked back along on the railroad track forty rods I suppose and got over into the orchard on this place and went across it, through the timber, and back through the other part—timber part—and then came back to the other side again about where we went in, and he (Alyea) said, 'Now we will go over and look at the house,' and we went over and looked at the house. There were no fences there. There were posts set at random around over the place as though there had been some, and there were some posts set something like there had been a fence, and there was a road through there. I said, 'This is the house, is it, Mr. Alyea?' and he said, 'Yes, sir'; and we went to the door, and we couldn't get in. He said, 'Here is a window that is loose,' and he just shoved the window up, and we went in

through the window and looked through the lower part and two rooms above, and he said, 'Well, the house is in better shape than I expected to find it, standing here idle.' I said, 'Yes, it is; I couldn't have expected to have found it in as good shape.' "

Alyea's statement of his connection with the trade, as shown by his deposition, is as follows: "My age is 51; residence, Atchison, Kansas; vocation, real estate. I have had dealings with J. W. Winkleblack concerning said lands. I went down there in the interest of the National Exchange Bank of Springfield, Mo., through their agent, A. S. Cowden, for the purpose of disposing of the land to J. W. Winkleblack. Yes, I went in behalf of the National Exchange Bank of Springfield, Mo., through their agent, A. S. Cowden, and showed him over the land. Their agent informed me there was a house on the land and I showed him the house that they told me to show. Q. State from whom you had a description of the land and its improvments prior to going down to show the land? A. From A. S. Cowden and a man named Fisher who used to own this land. I went there for the purpose of showing this land for A. S. Cowden, the agent of the National Exchange Bank. Q. At the time you went down to Howell county with Mr. Winkleblack, did you know the owner of the land Winkleblack went to see, and if so, state the owner, and how you knew who the owner was? A. I did; the owner was the National Exchange Bank of Springfield, Mo., and I knew that through A. S. Cowden, their agent."

On their return from Howell county, Alyea and plaintiff stopped at Springfield where the trade was consummated. Concerning his interview with Cowden, agent for the bank, plaintiff testified: "Q. Had you ever met Mr. Cowden before? A. No, sir. We went into Mr. Cowden's office and Alyea introduced me to Mr. Cowden, and said, 'Here is Mr. Winkleblack from Kansas City, Kansas, and we have been down to look at this land at Sterling.' Mr. Cowden said, 'Well, what did

you conclude as to this matter?' and Mr. Alyea turned and told him then what the arrangements were, and he said to me, 'Mr. Winkleblack hasn't really said to me yet whether he is going to trade or not, but we have come up to see about it.' I told him I guessed we would make the trade if it could be made in that way, and he said, 'Well, then, we take your place with the $100 against it, and you give us $500 in notes, and we make you a deed to the other place.' I said, 'Yes, that is the way Mr. Alyea and I had talked it over as we came here.' Then Mr. Cowden said if that was satisfactory we would make out the deed, and that I should go back to Kansas City, Kansas, and make the deed to mine and send it to him. I asked, and so did Mr. Alyea, I remember, 'Who is the deed to be made out to in Kansas City, Kansas?' and he said, 'Leave it blank.' Q. Well, you made the exchange? A. Yes, sir. Q. To whom did you make the deed to your property in Kansas City, Kansas? A. I made it in blank. . . . Q. Did you move into the house? A. Yes, sir; I moved into this house. I got the information that the house wasn't on the land before I moved down here, but just before that I had already given up my job, and had gotten ready to move. Then I was notified that the house was not on the place, or that they thought it was not on the place. Probably a month after I moved into the house, the agent for the land that the house is on came and told me that the house was not on my land. Q. They claimed the house, and you had the land surveyed? A. Yes, we had it surveyed. I got the county surveyor to survey it. Q. You have been living there all the time since? A. Yes, sir. Q. There is no house on the farm whatever? A. No, sir; no buildings whatever. . . . By Mr. Johnson: Q. Who did you make this trade with? A. I made this trade with W. S. Alyea. Q. He is the only one you ever conferred with in regard to it; he showed you the land? A. He showed me the land. Q. Did you ever talk to anyone else before the trade was made? A. Yes, sir; to A. S.

Cowden. Q. Those are the only ones you did talk to about it? A. Yes, sir."

From a careful consideration of the evidence, it is unquestionable that the defendant bank had no knowledge whatever of the connection or agency of Alyea in making the exchange of the lands, and the facts are undisputed that neither the officers of the bank nor Cowden as its agent represented to the plaintiff that there was any house on the land in question. Further, there is no evidence that Cowden, as agent of the bank, was in any way authorized to delegate his authority or to employ a sub-agent, and the officers of the bank knew nothing of the assistance Alyea was rendering in promoting the trade; so that Alyea, in showing plaintiff the land and making the representations as to the house, was at most the agent of Cowden, and as the agent of an agent, was not the agent of the bank. There is an entire failure of evidence that Cowden, the actual agent of the bank, ever had any interview with the plaintiff, except as we have stated, and in that interview, according to plaintiff's own testimony, he made no representation that the house was on the land of the defendant and held out no such inducement to make the exchange of properties; that such representations were made entirely by Alyea. The statements of Cowden and Alyea in their testimony as to whether Cowden in fact knew or made any representation to Alyea as to the house being on the land sold to the plaintiff are so sharply conflicting as to be irreconcilable. From the fact, however, that Alyea went to Howell county with the plaintiff for the express purpose of showing him the premises and inducing the exchange of the land, and from his showing the house to plaintiff and representing that it was on the land, it is conclusive that plaintiff was induced to believe and did believe that the house was on the land and made the exchange of the properties with that understanding.

If an agent could appoint another agent without the principal's authority, and he, another agent, and the

principal should be held liable for all of them, such agglutinating would result in an endless chain of interlopers and necessarily revolutionize all present business methods. The law is otherwise. By an unauthorized delegation of his authority, or by the employment of a sub-agent on his own account, the agent makes himself personally responsible for the acts of the sub-agent, who is regarded as his agent and not as the agent of the principal. And as there exists no privity of contract between the principal and such sub-agent, there is no liability by the principal. [31 Cyc. 1429; Commercial & Agri. Bank v. Jones, 18 Tex. 811.] *Delegata potestas non potest delegari.* [Chouteau Land & L. Co. v. Chrisman, 204 Mo. 1. c. 378, 102 S. W. 973.] The general rule is that an agent in whom is reposed trust or confidence, or who is required to exercise discretion or judgment, may not intrust the performance of his duties to another without the concent of his principal; and since nearly all acts of agency involve discretion, and the very selection as agent ordinarily implies personal confidence in the agent chosen, it follows that one clothed with authority to act for a principal must ordinarily perform the act himself. [31·Cyc. 1425.]

Nor can the bank be held to have ratified the unauthorized representations by the sub-agent because no knowledge is brought home to it of the acts of such sub-agent or of his representations. The mere fact that the principal has received or enjoyed the benefits of an unauthorized act will not amount to a ratification if he did so in ignorance of the facts; nor will his retention of such benefits after knowledge of the facts amount to a ratification if at the time he acquires such knowledge and without his fault conditions are such that he cannot be placed in statu quo or repudiate the entire transaction without loss. [31 Cyc. 1269; Clark v. Clark, 59 Mo. App. 532.]

The evidence in this case shows that plaintiff made the deed to his property in Kansas City, Kansas, to

Alyea; that at first it was executed in blank, but that before the deal was consummated he was notified that Alyea was to take his house and lot in Kansas City, Kansas, and pay the defendant bank the amount that was due on the purchase price of the land. Hence the title to the land had passed from plaintiff to Alyea at the time defendant was informed of plaintiff's claim of fraudulent representations. Besides, one of the notes of $100 which plaintiff had executed, secured by deed of trust on the Howell county land, had been transferred. Therefore, it was impossible, without loss to the defendant, to place the plaintiff in statu quo.

Under the law and the evidence, the finding of the trial judge was for the right party and the judgment is affirmed. All concur.